**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION**

| | |
|---|---|
| THE MANUFACTURED HOUSING INSTITUTE; and THE TEXAS MANUFACTURED HOUSING ASSOCIATION,<br><br>        Plaintiffs,<br><br>   v.<br><br>THE UNITED STATES DEPARTMENT OF ENERGY; and JENNIFER M. GRANHOLM,<br><br>        Defendants. | No. 1:23-CV-00174-DAE |

**<u>DEFENDANTS' MOTION TO DISMISS</u>**

**TABLE OF CONTENTS**

STATEMENT .................................................................................................................................. 1

INTRODUCTION .......................................................................................................................... 1

BACKGROUND ............................................................................................................................ 2

I.      The Energy Independence and Security Act of 2007 ........................................................ 2

II.     The Energy Conservation Standards for Manufactured Homes ....................................... 3

III.    History of Present Litigation and Compliance Delay Rule ............................................... 5

IV.   Plaintiffs' First Amended Complaint ................................................................................. 6

LEGAL STANDARDS .................................................................................................................. 7

ARGUMENT .................................................................................................................................. 7

I.      Plaintiffs' Claims are Not Fit for Judicial Decision ........................................................... 9

II.     Plaintiffs Will Not Suffer Hardship in the Absence of Judicial Review ........................ 12

CONCLUSION ............................................................................................................................ 14

**STATEMENT**

Defendants, the United States Department of Energy and Jennifer M. Granholm, Secretary of Energy, hereby move pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for dismissal of this action for lack of subject matter jurisdiction because this case is not currently ripe for adjudication.

**INTRODUCTION**

Plaintiffs, the Manufactured Housing Institute ("MHI") and the Texas Manufactured Housing Association ("TMHA"), seek a declaration that a rule establishing Energy Conservation Standards for Manufactured Housing ("Standards Rule") promulgated by the Department of Energy ("DOE") violates the Administrative Procedure Act ("APA").  Plaintiffs also request that the Court enjoin DOE from implementing or enforcing any aspect of the Standards Rule.  Plaintiffs argue that the Standards Rule is both arbitrary and capricious and contrary to the Energy Independence and Security Act of 2007 ("EISA") because, among other things, DOE failed to establish testing, compliance, and enforcement procedures and, as a result, failed to consider related costs in its economic analysis.

Plaintiffs' claims are not ripe because they seek relief from a rule that is not yet mandatory and from enforcement and compliance mechanisms that do not yet exist.  As this Court is aware, DOE has delayed manufacturer compliance with the Standards Rule so that it can engage in further rulemaking to establish enforcement procedures.  That rulemaking will clarify how manufacturers must demonstrate compliance, set forth procedures for how DOE will enforce noncompliance, and address the estimated costs associated with those procedures—some of the very issues that Plaintiffs want this Court to decide now, before DOE itself has determined and explained its procedures.  Permitting DOE to complete its rulemaking process would, therefore, significantly

advance the Court's ability to review Plaintiffs' claims by providing a more concrete setting, allowing the Court to avoid entangling itself in abstract disagreements fueled by Plaintiffs' speculations regarding how DOE may evaluate and enforce manufacturer compliance with the Standards Rule's requirements.  As such, Plaintiffs' claims are not currently fit for judicial review.

Moreover, delay of mandatory compliance with the Standards Rule until after DOE promulgates its compliance and enforcement procedures ensures that Plaintiffs' members will not suffer any hardship during the pendency of DOE's forthcoming rulemaking.  Because the Standards Rule is not being enforced, Plaintiffs do not have to choose between complying with a set of regulations they believe to be unlawful or risking potential civil liability for noncompliance.

Having this Court decide Plaintiffs' claims now, before DOE has completed its rulemaking process, would interfere with the agency's regulatory process—a process that, if allowed to proceed on its own, may resolve some of Plaintiffs' concerns.  At a minimum, DOE's rulemaking will clarify issues for more intelligent resolution.  Withholding judicial consideration of Plaintiffs' claims would also preserve the resources of both the Court and the parties by avoiding piecemeal litigation on matters that may be superseded by subsequent agency action.  Because the Standards Rule is not being enforced prior to subsequent rulemaking from DOE, there is no harm to Plaintiffs in waiting for that rulemaking to be completed.  This case should be dismissed.

## BACKGROUND

### I.     The Energy Independence and Security Act of 2007

Congress enacted EISA in 2007 to increase the energy efficiency of products and buildings, including manufactured homes.  Pub. L. 110-140, tit. IV, subtit. A, § 413, 121 Stat. 1492, 1601 (Dec. 19, 2007) (*codified* at 42 U.S.C. § 17071(a)(1)).  Manufactured homes are constructed in accordance with Federal construction standards administered by the U.S. Department of Housing

2

and Urban Development ("HUD").  *See* 24 C.F.R. pt. 3280.  EISA, however, directs the Secretary of Energy, rather than HUD, to "establish standards for energy efficiency in manufacturing housing" after both "notice and an opportunity for comment" by stakeholders and consultation with HUD.  42 U.S.C. §§ 17071(a)(1)-(2).  HUD, in turn, may seek counsel from the Manufactured Housing Consensus Committee ("MHCC").  *Id.*  EISA further requires the energy conservation standards:

> be based on the most recent version of the International Energy Conservation Code [("IECC")] (including supplements), except in cases in which the Secretary finds that the code is not cost-effective, or a more stringent standard would be more cost effective, based on the impact of the code on the purchase price of the manufactured housing and on total life-cycle construction and operating costs.

*Id.* § 17071(b)(1) (footnote omitted).

In establishing the standards, the Secretary may consider "design and factory construction techniques[,]" base the standards on "the climate zones established by [HUD,]" and "provide for alternative practices that result in net estimated energy consumption equal to or less than the specific standards."  *Id.* §§ 17071(b)(2)(A)-(C).  EISA requires the standards to be updated within one year following "any revision" to the IECC.  *Id.* § 17071(b)(3)(B).  The IECC is generally "revised every three years."  *Sierra Club v. Perry*, 373 F. Supp. 3d 128, 132 (D.D.C. 2019) (citation omitted).

**II.    The Energy Conservation Standards for Manufactured Homes**

Pursuant to EISA's directive, in May 2022, after a long and careful rulemaking, DOE promulgated a tiered set of energy conservation standards for manufactured homes based on the 2021 IECC.  *See Energy Conservation Program: Energy Conservation Standards for Manufactured Housing*, 87 Fed. Reg. 32,728 (May 31, 2022), *codified at* 10 C.F.R. pt. 460; *see also* Defs.' Mem. in Opp'n to Pls.' Mot. to Stay Agency Action, 4-5, ECF No. 32 (summarizing rulemaking history).  The Standards Rule mandated compliance on and after May 31, 2023.  87

3

Fed. Reg. 32,728.  Under the rule, the stringency of the requirements for each tier depends on the number of sections of the manufactured home.  *Id.* at 32,730.  Both Tier 1 and Tier 2 incorporate building thermal envelope components subject to the 2021 IECC that DOE determined applicable and appropriate for manufactured homes.  *Id.*  Tier 1 applies these building thermal envelope provisions to single-section homes at stringencies that would increase the purchase price by less than $750 in order to address affordability concerns raised by HUD.  *Id.*; *see also id.* at 32,742-43.  Tier 2 applies these same provisions to multi-section homes but at higher stringencies specified in the 2021 IECC, with an alternative exterior wall insulation requirement (R-21) for HUD climate zones 2 and 3.  *Id.* at 32,730.  Standards for both tiers include provisions addressing duct and air sealing, insulation installation, HVAC and service hot water system specifications, mechanical ventilation fan efficacy, and heating and cooling equipment sizing.  *Id.*

DOE determined the standards for both Tier 1 and Tier 2 homes are cost effective when evaluating the impact of the standards on both the purchase price and on the total 30-year life-cycle construction and operation costs.  *See id.* at 32,735; *see also* 42 U.S.C. § 17071(b).  Additionally, DOE concluded that the benefits realized by the standards, including energy savings and emission reductions, outweigh the burdens.  *See* 87 Fed. Reg. at 32,735.

Manufacturers may comply with the standards by using one of two methods:  the prescriptive method, which uses the components specified by DOE, or the performance method, which allows for compliance based on the overall thermal transmittance performance of the home.  *Id.* at 32,741.  Although the Standards Rule does not establish procedures for either DOE's evaluation of compliance or enforcement of noncompliance, DOE noted that "many of the requirements in the standards would require minimal compliance efforts[,]" such as documenting the use of materials already subject to separate Federal or industry standards, and thus impose

4

"minimal additional costs." *Id.* at 32,758. DOE further noted that it would continue to consult with HUD regarding potential approaches for compliance and enforcement "that may leverage the existing HUD inspection and enforcement process to ensure manufacturer compliance with the standards" is "not overly burdensome or costly[.]" *Id.*; *see also id.* at 32,743. Finally, DOE stated that it would consider the comments it had received about compliance and enforcement issues, "including an analysis of any related costs," in a future agency action. *Id.* at 32,757-58.

### III. History of Present Litigation and Compliance Delay Rule

Plaintiffs filed this lawsuit on February 14, 2023, alleging that the Standards Rule is both arbitrary and capricious and contrary to law and thus violates the APA because it: (1) imposes an unreasonable one-year window for compliance; (2) mandates compliance before DOE establishes testing procedures or a compliance and enforcement scheme; (3) fails to consider any costs relating to testing procedures or a compliance and enforcement scheme; (4) fails to consider the actual cost of compliance due to current economic conditions, thereby failing to consider whether the standards will greatly impact the purchase price, as well as the total life-cycle construction and operation costs of homes; and (5) is the result of DOE's failure to meaningfully consult with HUD. *See* Compl. ¶¶ 114-117, 122-28, ECF No. 1. On that same day, Plaintiffs moved for a stay of the May 31, 2023, compliance date. *See* Pls.' Mot. to Stay Agency Action, ECF No. 5.

On March 24, 2023, DOE published a Notice of Proposed Rulemaking ("NOPR") to delay the Standards Rule's May 31, 2023, compliance date in order to provide the agency with additional time to establish enforcement procedures that would provide clarity to manufacturers and other stakeholders regarding how DOE would evaluate compliance and the procedures DOE would use to enforce the standards. *See Energy Conservation Program: Energy Conservation Standards for Manufactured Homes; Extension of Compliance Date*, 88 Fed. Reg. 17,745 (Mar. 24, 2023). DOE

5

published a final rule on May 30, 2023, delaying the compliance date until, for Tier 1 homes, 60 days after issuance of enforcement procedures, and, for Tier 2 homes, until July 1, 2025. *Energy Conservation Program: Energy Conservation Standards for Manufactured Housing; Extension of Compliance Date*, 88 Fed. Reg. 34,411 (May 30, 2023) ("Delay Rule"). DOE approximates that it will publish a NOPR setting forth its proposed enforcement procedures in or before February 2024. *See* Office of Management and Budget, Office of Information and Regulatory Affairs, Unified Agenda, *Energy Conservation Program: Energy Conservation Standards for Manufactured Housing; Enforcement Procedures*, RIN 1904-AF54, https://www.reginfo.gov/public/do/eAgendaViewRule?pubId=202304&RIN=1904-AF54 (last visited Sept. 23, 2023).

In light of the Delay Rule, the parties agreed Plaintiffs' motion to stay the compliance date was moot. *See* Joint Advisory ¶ 5, ECF No. 42. Plaintiffs subsequently amended their Complaint on August 11, 2023. *See* Pls.' First Am. Compl. Seeking Permanent Declaratory & Injunctive Relief Under the APA, ECF No. 48.

## IV.   Plaintiffs' First Amended Complaint

Plaintiffs' First Amended Complaint largely tracks their original Complaint. Indeed, in summarizing the First Amended Complaint, Plaintiffs explain that "[o]ther than Plaintiffs' challenge to the . . . May 31, 2023 compliance date . . . all substantive defects to the Final Rule as addressed in Plaintiffs' original complaint . . . remain." First Am. Compl. ¶ 1. Plaintiffs claim that the Standards Rule is both arbitrary and capricious and contrary to law because DOE failed to (1) consider the costs related to testing procedures or compliance and enforcement; (2) account for the actual costs necessary to comply with the Final Rule due to current economic conditions; (3) ensure manufactured housing remains affordable for low-income purchasers; and (4) meaningfully

6

consult with HUD. First Am. Compl. ¶¶ 114-16, 122-25. Plaintiffs seek a declaration that the Standards Rule is invalid in its entirety and an injunction prohibiting DOE from implementing or enforcing any aspect of the Standards Rule. *Id.*, Prayer for Relief (a)-(b).

## LEGAL STANDARDS

Federal Rule of Civil Procedure 12(b)(1) requires dismissal of a complaint where "the court lacks the statutory or constitutional power to adjudicate the case." *Walmart Inc. v. U.S. Dep't of Justice*, 21 F.4th 300, 307 (5th Cir. 2021) (citation omitted). "Article III of the United States Constitution provides that federal courts have the power to decide only actual cases or controversies." *Choice Inc. of Tex. v. Greenstein*, 691 F.3d 710, 714-15 (5th Cir. 2012) (citing U.S. Const. art. III, § 2). "The justiciability doctrines of standing, mootness, political question, and ripeness 'all originate in Article III's 'case' or 'controversy' language.'" *Id.* at 715 (citation omitted). "The plaintiff[s], as the party asserting jurisdiction, bears the burden of proof." *Id.* at 714. "In assessing jurisdiction, the district court is to accept as true the allegations and facts set forth in the complaint." *Id.* "Additionally, 'the district court is empowered to consider matters of fact which may be in dispute.'" *Id.* (quoting *Ramming v. United States*, 281 F.3d 158, 161 (5th Cir. 2001)).

## ARGUMENT

Plaintiffs' claims are not ripe for judicial review. "At its core, ripeness is a matter of timing that serves to prevent courts from entangling themselves in cases prematurely." *Walmart*, 21 F.4th at 312 (citation omitted). "The ripeness doctrine's basic rationale is 'to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies[.]'" *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 732-33 (1998) (quoting *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 148 (1967)). The ripeness doctrine also

7

"'protect[s] . . . agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties.'" *Id.* at 733 (quoting *Abbott Lab'ys*, 387 U.S. at 148-49). Accordingly, "[i]f [a] purported injury is 'contingent on future events that may not occur as anticipated, or indeed may not occur at all,' the claim is not ripe for adjudication." *Lopez v. City of Hous.*, 617 F.3d 336, 342 (5th Cir. 2010) (alteration omitted) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)). "For these reasons, a ripeness inquiry is often required when a party is seeking[,]" as Plaintiffs seek here, "*pre-enforcement* review of a law or regulation." *Roark & Hardee LP v. City of Austin*, 522 F.3d 533, 544 (5th Cir. 2008) (emphasis in original).

"A declaratory judgment action is ripe for adjudication only where an 'actual controversy' exists." *Walmart*, 21 F.4th at 311 (quoting *Orix Credit All., Inc. v. Wolfe*, 212 F.3d 891, 896 (5th Cir. 2000)); *see also United Transp. Union v. Foster*, 205 F.3d 851, 857 (5th Cir. 2000) ("Declaratory judgments are typically sought before a completed 'injury-in-fact' has occurred . . . but still must be limited to the resolution of an 'actual controversy.'") (citation omitted). "Whether an actual controversy exists must be determined on a case-by-case basis, but '[a]s a general rule, [one] exists where 'a substantial controversy of sufficient immediacy and reality [exists] between parties having adverse legal interests.'" *TOTAL Gas & Power N. Am., Inc. v. FERC*, 859 F.3d 325, 333 (5th Cir. 2017) (quoting *Orix Credit All.*, 212 F.3d at 896). To determine whether an actual controversy exists such that a declaratory judgment action is ripe for adjudication, courts conduct "a twofold inquiry[,] . . . 'evaluat[ing] both the fitness of the issues for judicial decision and the hardship to the parties of withholding court consideration.'" *Walmart*, 21 F.4th at 311 (quoting *Abbott Lab'ys*, 387 U.S. at 149). Both prongs must be satisfied for a declaratory judgment action to be ripe for judicial review. "Unsuitability for review is determinative." *Huawei Techs.*

8

*USA, Inc. v. FCC*, 2 F.4th 421, 435 n.30 (5th Cir. 2021) (citation omitted). Similarly, a court need not "address the fitness of the issues for judicial decision" where a plaintiff "has not satisfied the hardship prong of the ripeness inquiry." *Choice Inc. of Tex.*, 691 F.3d at 718. Plaintiffs' claims fail to satisfy either prong.

**I.      Plaintiffs' Claims are Not Fit for Judicial Decision**

"[I]n the context of pre-enforcement agency action there are several established factors" courts must consider when evaluating the "fitness for decision[,]" prong "including 'whether the issue presented is a purely legal one, whether consideration of that issue would benefit from a more concrete setting, and whether the agency's action is sufficiently final.'" *Walmart*, 21 F.4th at 311 (quoting *Ciba-Geigy Corp. v. EPA*, 801 F.2d 430, 435 (D.C. Cir. 1986). "Failure on even one of the three prongs can render a case unfit for judicial review." *Id.* (citing *Nat'l Park Hospitality Ass'n v. U.S. Dep't of Interior*, 538 U.S. 803, 812 (2003)).

It is without question that Plaintiffs' claims present purely legal issues. *See Cement Kiln Recycling Coal v. EPA*, 493 F.3d 207, 215 (D.C. Cir. 2007) ("It is well established that claims that an agency's action is arbitrary and capricious or contrary to law present purely legal issues.") (alteration and citation omitted). Nevertheless, Plaintiffs' claims are not fit for judicial decision because "allowing more time for development of events would significantly advance [the Court's] ability to deal with the legal issues presented or aid [the Court] in their resolution." *Roman Cath. Diocese of Dall. v. Sebelius*, 927 F. Supp. 2d 406, 425 (N.D. Tex. 2013) (quoting *Doe v. Bush*, 323 F.3d 133, 138 (1st Cir. 2003)); *see also Nat'l Park Hospitality Ass'n*, 528 U.S. at 812.

Plaintiffs' claims include allegations that DOE failed to consider the "costs related to testing procedures or compliance and enforcement" and the "impact" of those costs on the "'purchase price of manufactured housing and on total life-cycle construction and operation

9

costs.'" First Am. Compl. ¶ 114 (quoting 42 U.S.C. § 17071(b)(1)); *see also id.* ¶ 122. Although DOE stated in the Standards Rule that "many of the requirements in the standards would require minimal compliance efforts[,]" such as documenting the use of materials already subject to separate Federal or industry standards, and thus impose "minimal additional costs[,]" the Department indicated it would establish formal compliance and enforcement procedures in a future agency action. 87 Fed. Reg. at 32,758.

As the Court is aware, DOE recently delayed the Standards Rule's compliance date so that it could engage in rulemaking to supplement the Standards Rule to include provisions addressing how DOE will evaluate manufacturer compliance with the standards and enforce noncompliance. *See* 88 Fed. Reg. 34,411; *see also id.* at 34,418 (reserving new subpart D of part 460 for forthcoming enforcement procedures). Development of compliance and enforcement procedures will necessarily include, as DOE noted in the Standards Rule, consideration of "any related costs[.]" 87 Fed. Reg. at 32,757. DOE's forthcoming rulemaking, therefore, will clarify the Department's position regarding issues relating to testing, compliance, enforcement, and associated costs.

Considering Plaintiffs' claims regarding those issues now, without the benefit of DOE's clarified position, would embroil the Court in the type of "abstract disagreements" the ripeness doctrine is designed to prevent. *Ohio Forestry Ass'n*, 523 U.S. at 732-33 (citation omitted). For example, Plaintiffs contend that the Standards Rule will require "[t]esting . . . to determine whether manufactured homes meet [duct system] leakage requirements" and that such testing "could cost approximately $1500 per home[.]" First Am. Compl. ¶ 77. But the Standards Rule does not require such testing. *See, e.g.*, 87 Fed. Reg. at 32,757. Plaintiffs' assertions are nothing more than speculation at this juncture; the forthcoming enforcement rulemaking will address how

manufacturer compliance will be evaluated.  *See* 88 Fed. Reg. at 34,411, 34,418.  That rulemaking may require duct system leakage testing—or it may not.  If duct system leakage testing is required, DOE's analysis may estimate that it costs $1500 per home—or it may not.  Postponing consideration of Plaintiffs' claims until after DOE completes the forthcoming rulemaking would allow the Court to resolve those issues in the context of a concrete—not hypothetical—dispute.

Postponing review of Plaintiffs' claims would also advance the ripeness doctrine's other interest—protecting agencies such as DOE from "judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Ohio Forestry Ass'n*, 523 U.S. at 733 (citation omitted).  Consideration of Plaintiffs' claims regarding testing, compliance, enforcement, and associated costs now would run counter to this interest by denying DOE an opportunity to determine and explain its procedures for evaluating manufacturer compliance with the standards and enforcing noncompliance, as well as an opportunity to apply its expertise to the analysis of any associated costs.

Finally, postponing consideration of Plaintiffs' claims would serve the interests of judicial economy.  In addition to "solidify[ing] or simpl[ifying] the factual context" of the dispute between the parties, "permitting [DOE's] administrative process to reach its end" may resolve some of Plaintiffs concerns, particularly with respect to testing, compliance, enforcement, and associated costs, thereby "narrow[ing] the legal issues at play, [which in turn] allow[s] for more intelligent resolution of any remaining claims[.]"  *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012).  It would also "avoid[] inefficient and unnecessary piecemeal review," *id.*, which "would contravene sound policies favoring judicial and administrative economy."  *Pennzoil Co. v. FERC*, 742 F.2d 242, 245 (5th Cir. 1984).  Accordingly, because consideration of Plaintiffs' claims will

benefit from further development of events, Plaintiffs' claims are not fit for judicial decision. *See Nat'l Park Hospitality Ass'n*, 538 U.S. at 812.

## II. Plaintiffs Will Not Suffer Hardship in the Absence of Judicial Review

"The Supreme Court has found hardship to inhere in legal harms, such as the harmful creation of legal rights or obligations; practical harms on the interests advanced by the party seeking relief; and the harm of being 'force[d] . . . to modify [one's] behavior in order to avoid future adverse consequences." *Texas v. U.S.*, 497 F.3d 491, 499 (5th Cir. 2007) (quoting *Ohio Forestry Ass'n*, 523 U.S. at 734); *see also Choice Inc. of Tex.*, 691 F.3d at 715 (citations omitted). Whether these legal harms rise to the level of hardship warranting judicial review, however, "depends" on the "degree" of the challenged "regulation's present effect on those seeking relief." *Toilet Goods Ass'n, Inc. v. Gardner*, 387 U.S. 158, 164 (1967). Stated differently, "to constitute a hardship, the impact of the [challenged] regulations must be 'sufficiently direct,' resulting in an 'immediate and significant change in the plaintiffs' conduct.'" *Roman Cath. Diocese of Dall.*, 927 F. Supp. 2d at 426 (quoting *Abbott Lab'ys*, 387 U.S. at 152-53); *see also Roark & Hardee LP*, 522 F.3d at 545 (hardship demonstrated "[w]here a regulation requires an immediate and significant change in the plaintiffs' conduct of their affairs") (citation omitted).

There is no question that, once DOE completes the forthcoming enforcement rulemaking and the compliance dates are fully known, manufacturers will have to modify their operations to avoid the legal consequences that will flow from noncompliance with the standards. *See* 42 U.S.C. § 17071(c). But at present, as the foregoing discussion demonstrates, the Standards Rule imposes no immediate legal obligation upon manufacturers to alter their operations. The Delay Rule provides manufacturers a reprieve from having to modify their operations until after DOE completes the forthcoming rulemaking. *See* 88 Fed. Reg. 34,418 (amending the Standards Rule's

12

compliance date to "60 days after promulgation of DOE's forthcoming enforcement procedures for Tier 1 homes, and until July 1, 2025, for Tier 2 homes"). Even upon completion of the forthcoming rulemaking on enforcement procedures, manufacturers would only face compliance obligations for Tier 1 homes initially, as Tier 2 compliance will not begin until July 2025. The Delay Rule also ensures that manufacturers will have the benefit of the clarification DOE intends to provide regarding how compliance will be evaluated, which will inform manufacturers' decisions regarding what steps they need to take to come into compliance with the standards. *See id.* at 34,413 ("Delaying the compliance date until after the enforcement procedures are issued provides manufacturers time to understand DOE's enforcement procedures and prepare their operations to ensure compliance with DOE's standards."). Until DOE promulgates compliance and enforcement procedures, manufacturers do not have to choose between altering their operations or risking potential civil liability once compliance with the standards becomes mandatory. Consequently, "no direct dilemma or Hobson's choice is faced by Plaintiff[s' members] now." *Roman Cath. Diocese of Dall.*, 927 F. Supp. 2d at 427; *see also Choice Inc. of Tex.*, 691 F.3d at 716 (observing that "[t]he presence of such a dilemma has been a central feature of cases in which the hardship prong of the ripeness inquiry was held to be satisfied on modification-of-behavior grounds").

In the meantime, Plaintiffs will have an opportunity to participate in DOE's development of the compliance and enforcement procedures by providing comments on DOE's forthcoming proposal. *See* 88 Fed. Reg. 34,413 ("DOE will provide notice and opportunity for stakeholders to comment on its enforcement procedures in the rulemaking process[.]"); *id.* at 34,415 ("DOE encourages commenters to participate in [enforcement procedures] rulemaking and provide feedback to the Department."). If, after DOE promulgates its compliance and enforcement

procedures, Plaintiffs have any remaining claims, they will be able to raise them then. Plaintiffs will not, therefore, suffer any hardship by delaying judicial consideration of their claims until after DOE completes the forthcoming rulemaking.

## CONCLUSION

For the foregoing reasons, Plaintiffs' claims that the Standards Rule violates the APA because it is arbitrary and capricious and contrary to law are not ripe for judicial review. The Court should accordingly dismiss Plaintiffs' First Amended Complaint for lack of subject matter jurisdiction.

Dated:  September 26, 2023

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

BRAD P. ROSENBERG
Special Counsel

/s/ *Kristina A. Wolfe*
KRISTINA A. WOLFE (VA Bar No. 71570)
Senior Trial Counsel
U.S. Department of Justice
Civil Division, Federal Programs Branch
P.O. Box 883, Ben Franklin Station
Washington, DC 20044
Tel: (202) 353-4519; Fax: (202) 616-8470
Email: Kristina.Wolfe@usdoj.gov

**CERTIFICATE OF SERVICE**

On September 26, 2023, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case filing system of the court. I hereby certify that I have served all counsel and/or pro se parties of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

<i>/s/ Kristina A. Wolfe</i>