IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| THE MANUFACTURED HOUSING INSTITUTE; and THE TEXAS MANUFACTURED HOUSING ASSOCIATION,<br>　　　　Plaintiffs,<br><br>vs.<br>THE UNITED STATES DEPARTMENT OF ENERGY; and JENNIFER M. GRANHOLM,<br>　　　　Defendants. | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | NO. 1:23-CV-174-DAE |

ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS'
MOTION TO DISMISS

Before the Court is Defendant the United States Department of Energy ("DOE") and Defendant Jennifer M. Granholm's Motion to Dismiss. (Dkt. # 49.) The Court held a hearing on April 24, 2024. After careful consideration of the memoranda filed in support of and in opposition to the motion and the arguments presented by counsel, the Court **GRANTS IN PART AND DENIES IN PART** Defendants' Motion to Dismiss.

BACKGROUND

This lawsuit involves a dispute between the manufactured housing industry and the Department of Energy. Plaintiff Manufactured Housing Institute ("MHI") is a national trade organization representing "all segments of the factory-

1

built housing industry," and Plaintiff Texas Manufactured Housing Association is an association that represents over 1,400 company members from the manufactured housing industry in Texas. (Dkt. # 48 at 8, 10.)

Manufactured homes must be constructed in accordance with federal construction standards administered by the U.S. Department of Housing and Urban Development ("HUD"). 24 C.F.R. pt. 3280. In 2007, Congress also involved the Secretary of Energy in the standards. Congress passed the Energy Independence of Security Act ("EISA"), which directed the Secretary of Energy, rather than HUD, to "establish standards for energy efficiency in manufacturing housing" after both "notice and an opportunity for comment" by stakeholders. 42 U.S.C. §§ 17071(a)(1)-(2). EISA also requires that the standards be based on the most recent version of the International Energy Conservation Code ("IECC"), unless "the Secretary finds that the code is not cost-effective, or a more stringent standard would be more cost effective, based on the impact of the code on the purchase price of the manufactured housing and on total life-cycle construction and operating costs." Id. § 17071(b)(1) (footnote).

In May 2022, the DOE adopted a tiered set of energy conservation standards for manufactured homes, mandating compliance by May 31, 2023 ("Standards Rule"). See Energy Conservation Program: Energy Conservation Standards for Manufactured Housing, 87 Fed. Reg. 32,728 (May 31, 2022),

2

codified at 10 C.F.R. pt. 460. The Standards Rule mandates that manufacturers include thermal envelop components to their manufactured homes. Id. Tier 1 regulations apply these building thermal envelope provisions to single-section homes. Id. Tier 2 applies the same building thermal envelope standards to multi-section homes, but at higher stringencies. Id. Standards for both tiers include provisions addressing duct and air sealing, insulation installation, HVAC and service hot water system specifications, mechanical ventilation fan efficacy, and heating and cooling equipment sizing. Id. Manufacturers comply with the standard by either (1) using components specified by the DOE or (2) meeting the standards for overall thermal transmittance of the home. Id. at 32,741.

The Standards Rule does not specify how DOE will enforce the new standards. DOE stated that it would consider the comments it had received about compliance and enforcement issues, "including an analysis of any related costs," in a future agency action. Id. at 32,757–58.

On February 14, 2023, Plaintiffs filed this suit, alleging that the Standards Rule violates the APA and EISA because the DOE (1) imposed an unreasonable one-year window for compliance, (2) mandated compliance before DOE established testing procedures or an enforcement scheme, (3) failed to consider costs relating to testing procedures or compliance and enforcement, (4) understating the actual costs necessary to comply with the Final Rule due to

current economic conditions, (5) failing the consult with HUD and (6) failing to ensure that manufactured housing remains affordable for low income purchasers. (Dkt. # 1.)  Plaintiffs ask the Court to declare the Standards Rule unlawful in its entirety.  (Dkt. # 1 at 45.)

On May 30, 2023, DOE published the May 2023 "Delay Rule," extending the May 31, 2023 compliance date.  Energy Conservation Program: Energy Conservation Standards for Manufactured Housing; Extension of Compliance Date, 88 Fed. Reg. 34,411 (May 30, 2023) ("Delay Rule").  The compliance date was extended to 60 days after the issuance of the enforcement procedures for Tier 1 homes, and until July 1, 2025 for Tier 2 multi-section homes. Id. at 34, 418.

The May 2023 Delay Rule promises "additional clarity to manufacturers and consumers regarding DOE's expectations of manufacturers and DOE's plans for enforcing the standards." Id. at 34,413.  The Rule states that "[d]elaying the compliance date until after the enforcement procedures are issued provides manufacturers time to understand DOE's enforcement procedures and prepare their operations to ensure compliance with DOE's standards." Id.  The DOE does not suggest that it will amend the Standards Rule itself.

Plaintiffs filed an Amended Complaint on August 11, 2023, removing claims about the immediacy of the compliance deadline, but maintaining its other

4

claims. (Dkt. # 48.) Defendants filed a Motion to Dismiss on September 26, 2023, claiming that Plaintiffs' claims are not yet ripe. (Dkt. # 49.) Plaintiffs filed a Response on October 26, 2023. (Dkt. # 50.) Defendants filed a Reply on December 7, 2024. (Dkt. # 52.) On January 17, 2024, Plaintiffs filed a Sur-Reply. (Dkt. # 55.) The Court held a hearing on April 24, 2024.

## LEGAL STANDARD

Rule 12(b)(1) authorizes dismissal of a complaint for lack of subject-matter jurisdiction. Home Builders Ass'n of Miss., Inc. v. City of Madison, Miss., 143 F.3d 1006, 1010 (5th Cir. 1998). Though Rule 12(b)(1) motions are often brought on the basis that the district court lacks either federal question jurisdiction (28 U.S.C. § 1331) or diversity of citizenship jurisdiction (28 U.S.C. § 1332), challenges to a plaintiff's standing to bring a claim may also be brought under 12(b)(1). See In re Wilson, 527 B.R. 253, 255 (Bankr. N.D. Tex. 2015) ("A motion to dismiss that attacks a party's standing 'is a jurisdictional matter." (quoting Broadhollow Funding LLC v. Bank of America, N.A., 390 B.R. 120, 128 (Bankr. D. Del. 2008)). "Standing goes to the 'case or controversy' limitation on federal court jurisdiction ... and a plaintiff's lack of standing 'robs the court of jurisdiction to hear the case.'" In re Hunt, 149 B.R. 96, 99 (Bankr. N.D. Tex. 1992) (citations omitted); see also In re Rhinesmith, 450 B.R. 630, 631 (Bankr.

5

W.D. Tex. 2011) (stating that "standing is a species of subject matter jurisdiction" (citing, inter alia, Sample v. Morrison, 406 F.3d 310, 312 (5th Cir. 2005)).

## DISCUSSION

The ripeness doctrine is "drawn both from Article III limitations on judicial power and from prudential reasons for refusing to exercise jurisdiction." Reno v. Catholic Soc. Services, Inc., 509 U.S. 43, 57, n.18 (1993).  The ripeness doctrine exists to "prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies" and to stall judicial interference until an administrative rule "has been formalized" and felt in a "concrete way" by the challenging parties." Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967), abrogated by Califano v. Sanders, 430 U.S. 99 (1977).  A declaratory judgment action is ripe when an "actual controversy" exists.  Orix Credit All., Inc. v. Wolfe, 212 F.3d 891, 896 (5th Cir. 2000).

Ripeness involves a two-part inquiry that requires courts to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship to the parties of withholding court consideration.  Abbott Labs, 387 U.S. at 149.

Defendants ask this Court to dismiss this case because Plaintiffs' claims are not yet ripe.  Defendants argue that Plaintiffs' claims are not yet fit for judicial decision because Defendants are in the process of clarifying enforcement

procedures.  Essentially, Defendants claim that the Court should wait until the Department of Energy has finished its enforcement rulemaking process, as it could allegedly resolve some of Plaintiffs' claims and clarify the issues.  The Department of Energy gave Plaintiffs 60 days to comply with the new standards after the final enforcement rules are promulgated; Defendants claim that this is the time that the claims will become ripe.  Defendants also contend that Plaintiffs will not suffer hardship in the absence of judicial review because Plaintiffs need not comply with the standards.

Plaintiffs respond that its claims are fit for judicial decision because Defendants are not reconsidering the underlying standards during the delay period, so the substance of Plaintiffs claims will not change. Plaintiffs also argue that they will suffer hardship in the absence of a judicial decision because Defendants expect manufacturers to begin modifying their operations to comply with DOE's new standards while DOE finalizes its enforcement procedures.  (Dkt. # 50 at 49.)

I.  Fitness of Issues for Judicial Review

In the context of pre-enforcement agency action, the issue of whether an issue is fit for judicial review is "fact-bound" and "somewhat abstract." Walmart Inc. v. U.S. Dep't of Justice, 21 F.4th 300, 311 (5th Cir. 2021).  There are several established factors, like whether the questions presented are purely legal ones, the challenged regulations constitute final agency action, and further factual

development would not significantly advance the court's ability to deal with the legal issues presented. Tex. v. United States, 497 F.3d 491, 498–99 (5th Cir. 2007). Defendants concede that Plaintiffs' challenge to the Standards Rule "presents purely legal issues." (Dkt. # 49 at 11.)

The finality rule should be applied in a "flexible" and "pragmatic" way, looking to whether the agency's position and "definitive" and whether it has a "direct and immediate…effect on day-to-day to business." Ciba-Geigy Corp. v. U.S.E.P.A., 801 F.2d 430 (D.C. Cir. 1986) (quoting Abbott Laboratories, 387 U.S. at 149-50; F.T.C. v. Standard Oil Co. of California, 449 U.S. 232, 101 S. Ct. 488, 66 L. Ed. 2d 416 (1980)).

First, the Standards Rule is a final rule that became effective on August 1, 2022. The DOE has stated that the standards are final and that manufacturers should begin to adjust practices to comply with the standards. The DOE only delayed the compliance date so that enforcement procedures could be issued. Energy Conservation Program: Energy Conservation Standards for Manufactured Housing; Extension of Compliance Date, 88 Fed. Reg. 34,411 (May 30, 2023). The DOE delayed the compliance date to provide "time for DOE to develop enforcement procedures" and (2) "clarify to manufacturers on when and how to comply" and (3) "time for manufacturers to adjust their practices consistent with DOE's enforcement procedures." Id. at 34,413. The DOE did not, however,

8

delay the compliance deadline to reconsider the standards themselves. Id. at 34,416 ("[C]omments regarding potential future collaboration or rulemaking with HUD regarding DOE's standards and/or HUD Code are outside the scope of the current rulemaking action.") The DOE has said that it is not reconsidering the standards themselves, indicating that the concerns about cost-effectiveness were addressed in the "May 2022 Final Rule." Id.; Cf. Roman Catholic Diocese of Dallas v. Sebelius, 927 F. Supp. 2d 406, 412 (N.D. Tex. 2013) (finding that a case was not ripe when the Defendants offered a proposed amendment to the implementing regulations that could change the underlying substantive rule).

The DOE has also stated that manufacturers should begin preparations so that they may comply with the new standards. Id. at 34,414 (Lead times in the final rule "provide enough time for DOE to issue its enforcement procedures, while manufactures begin modifying their practices to comply with DOE's standard.") Once an agency publicly articulates an unequivocal position and expects regulated entities to alter their primary conduct to conform to that position, the agency has voluntarily relinquished the benefit of postponed judicial review. Ciba-Geigy Corp. v. U.S.E.P.A., 801 F.2d 430, 436 (D.C. Cir. 1986). Therefore, this factor supports finding the case ripe for review.

The Court will also not benefit from further factual development on the majority of the issues because many of Plaintiffs' issues with the Standards

9

Rule will not be resolved or further informed by the DOE's additional enforcement rulemaking.

First, Plaintiffs' complaint that DOE violated its statutory mandate to consult with HUD in promulgating the Standards Rule will not be impacted by any consultation with HUD in the enforcement rulemaking process. (See Dkt. # 48 at 37.) Plaintiff complains that the lack of consultation with HUD when promulgating the standards violates the DOE's statutory mandate, and this will not be cured by any further factual development in the enforcement rulemaking process.

Second, Plaintiffs' claim that DOE understated actual costs in its rulemaking for the Standards Rule will also not be impacted by further factual development in the enforcement rulemaking process. Plaintiffs specifically challenge DOE's hypothetical materials cost it used to develop standards – standards that it fully intends to enforce. (Id.) Any factual development in the enforcement rulemaking process will not impact this claim.

Third, Plaintiffs complain that the standards themselves will not be cost-effective for low-income purchasers or multi-section homes with a personal property loan, disproportionately affecting minority groups. (Dkt. # 48 at 40.) Testing, compliance, and enforcement rulemaking will have no impact on the final standards, so further factual development will not aid this inquiry.

Finally, Plaintiffs' last claim focuses on DOE's alleged failure to account for "costs related to testing procedures or compliance and enforcement" when promulgating the standards. As opposed to Plaintiffs' other claims, the dispute over actual enforcement costs would benefit from further factual development in the enforcement rulemaking process. For example, the Department of Energy has asserted that, in DOE's supplemental enforcement rulemaking, the DOE will clarify how the agency will evaluate manufacturer compliance with the standards, set forth procedures for enforcing noncompliance, and address associated costs. (Dkt. # 52 at 2.) By waiting to see what enforcement and compliance standards DOE intends to use, the Court can evaluate whether compliance with the new standards really only requires "minimal compliance efforts," and therefore, would not have made a difference in the promulgation of the standards. (Dkt. # 52 at 4.) To avoid pre-mature adjudication of claims that could benefit from further factual development, the Court will dismiss the claims related to DOE's failure to account for enforcement costs. That said, this dismissal will be without prejudice, so that Plaintiffs may re-file its claim once DOE has finished its enforcement rulemaking process.

II.   Plaintiffs' Hardship

"[S]ome degree of hardship is always required to establish ripeness." Cochran v. U.S. Sec. & Exch. Comm'n, 20 F.4th 194, 212 (5th Cir. 2021).

In Plaintiffs' complaint, Plaintiffs allege that its members will be forced to redesign all their homes and retool all of their factories to comply with the Final Rule. (Dkt. # 48 at 38.) Defendants claim that Plaintiffs will be given sufficient time to comply with the Final Rule *after* the final enforcement procedures are announced. Yet this period is only sixty days for Tier One, and a little over year from this order for Tier Two. Practically, Plaintiffs would need more than sixty days to modify practices like home designs and factory configuration.

DOE even admits that Plaintiffs should begin to adjust their practices in the Delay Rule, stating that the compliance date was delayed to give "manufacturers time to understand DOE's enforcement procedures and prepare their operations to ensure compliance with DOE's standards." 88 FR 34,411 at 34,414. The DOE also stated that lead times in the final rule "provide enough time for DOE to issue its enforcement procedures, *while* manufactures begin modifying their practices to comply with DOE's standard." Id. The DOE itself has admitted that manufacturers should begin adjusting their practices during the delay period to comply with standards.

Waiting until a new compliance date to bring this suit constitutes sufficient hardship for the manufactured housing industry. See Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 734 (1998) (a party's challenge is ripe when it is forced to "modify its behavior in order to avoid future adverse

consequences, as, for example, agency regulations can sometimes force immediate compliance through fear of future sanctions"); Nat'l Propane Gas Ass'n v. U.S. Dep't of Transp., 43 F. Supp. 2d 665 (N.D. Tex. 1999) (finding that regulations that require plaintiffs to adjust their conduct immediately were ripe for judicial review).

For these reasons, many of Plaintiffs' claims challenging the standards themselves shall not be dismissed at this stage for ripeness concerns.

## CONCLUSION

Based on the foregoing reasons, the Court **GRANTS IN PART** and **DENIES IN PART** Defendants' Motion to Dismiss (Dkt. # 49). The Court will dismiss Plaintiffs' claims relating to DOE's failure to consider enforcement costs **WITHOUT PREJUDICE**. The remaining claims survive. Plaintiffs may amend their complaint after the DOE has completed its enforcement rulemaking process.

**IT IS SO ORDERED.**

**DATED:** Austin, Texas, May 1, 2024.

_____
David Alan Ezra
Senior United States District Judge