**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS**

|  |  |
|---|---|
| THE MANUFACTURED HOUSING INSTITUTE; and THE TEXAS MANUFACTURED HOUSING ASSOCIATION,<br><br>        Plaintiffs,<br><br>  v.<br><br>THE UNITED STATES DEPARTMENT OF ENERGY; and JENNIFER M. GRANHOLM, Secretary of the United States Department of Energy in her official capacity only,<br><br>        Defendants. | Civil Action No.: 23-cv-00174 |

<u>**PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**</u>

Carlos R. Soltero
State Bar of Texas No. 00791702
csoltero@maynardnexsen.com
Gregory P. Sapire
State Bar of Texas No. 00791601
gsapire@maynardnexsen.com
MAYNARD NEXSEN PC
2500 Bee Cave Road, Bldg 1, Suite 150
Austin, Texas 78746
(512) 422-1559 – Telephone
(512) 359-7996 – Facsimile

Thomas W. Thagard (*pro hac vice*)
State Bar of Texas No. 24134186
tthagard@maynardnexsen.com
James C. Lester (*pro hac vice*)
jlester@maynardnexsen.com
MAYNARD NEXSEN PC
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203
(205) 254-1000 – Telephone

Scott Simpson (*pro hac vice*)
wsimpson@smgblawyers.com
Daniel S. Weber (*pro hac vice*)
dsweber@smgblawyers.com
SIMPSON, MCMAHAN, GLICK & BURFORD, PLLC
100 Concourse Parkway
Suite 310 West Tower
Hoover, AL 35244
(205) 876-1600 – Telephone

*Attorneys for Plaintiffs*

## **TABLE OF CONTENTS**

INTRODUCTION ................................................................................................. 3

STATEMENT OF UNDISPUTED FACTS ......................................................... 5

PROCEDURAL HISTORY ................................................................................ 14

STANDARD OF REVIEW ................................................................................ 16

ARGUMENT ...................................................................................................... 17

    I.    DOE Failed to Consider Material Economic Realities in Promulgating the Final Rule ....................................................................................................... 18

        A.    DOE ignored historic inflation and substantial construction cost increases. ............................................................................................... 19

        B.    DOE ignored substantial interest rate hikes. .......................................... 21

        C.    DOE's disregard of material economic realities was arbitrary and capricious. .............................................................................................. 22

    II.    DOE Arbitrarily Ignored Affordability Concerns and Offered Explanations Counter to the Evidence Before It. ...................................................................... 26

    III.    DOE Failed to Consult with HUD in Violation of the EISA ............................. 29

CONCLUSION .................................................................................................... 32

CERTIFICATE OF SERVICE ........................................................................... 34

Plaintiffs the Manufactured Housing Institute ("MHI") and the Texas Manufactured Housing Association ("TMHA," and with MHI, "Plaintiffs") hereby move for summary judgment on all counts of their First Amended Complaint, *see* Dkt. No. 48 ("FAC"), challenging the Department of Energy's ("DOE") final rule setting energy standards for manufactured housing, *see* 87 Fed. Reg. 32,728 (the "Final Rule"). The Final Rule violates both the Administrative Procedures Act (the "APA"), 5 U.S.C. § 551, *et seq.*, and the Final Rule's enabling legislation, the Energy Independence and Security Act of 2007 (the "EISA"), 42 U.S.C. § 17071, and should be set aside pursuant to 5 U.S.C. § 706(2).

## **INTRODUCTION**

Manufactured housing is an indispensable part of America's affordable housing market generally and Texas specifically, where over 20% of the nation's manufactured homes are built. *See* Admin. R., Doc. 1628 (Ex. 1), at 1 (Nov. 22, 2021 comment by TMHA). Since 1974 when Congress federalized manufactured housing standards, HUD has exclusively created and enforced national building standards for manufactured housing. *See* 24 C.F.R. Parts 3280 and 3282 (the "HUD Code"). An express purpose of HUD's legislative mandate is "to facilitate the availability of affordable manufactured homes and to increase homeownership for all Americans." 42 U.S.C. § 5401(b)(2).

In 2007, Congress enacted the EISA, granting DOE limited rulemaking authority to promulgate energy efficiency standards for manufactured housing. In doing so, Congress imposed two critical safeguards to ensure that DOE's rulemaking does not undermine affordability. *First*, to leverage HUD's expertise with the industry and affordable housing generally, the EISA directs DOE to consult with HUD in preparing its standards. *See* 42 U.S.C. § 17071(a)(2)(B) (providing that DOE is obligated to consult with HUD "who may seek further counsel from the Manufactured

Housing Consensus Committee").

*Second*, the EISA directs that, in promulgating new energy standards, DOE must ensure that the standards are "cost-effective," taking into account the economic impact on "the purchase price of manufactured housing and on total life-cycle construction and operating costs." 42 U.S.C. § 17071(b)(1). That is, federally mandated energy efficiency standards should result in net savings for homeowners, not a net loss. Moreover, given the importance of ensuring that manufactured housing remains affordable, DOE must establish that its energy standards are cost effective for low-income households—not just households at a median or average income level. *See* 87 Fed. Reg. at 32,745, 32,749; Admin. R., Doc. 1999 (Ex. 2), at 9-2 (DOE acknowledging that affordability concerns "interrelate" with its mandate to ensure its standards are "cost-effective").

The Final Rule fails in each of these respects. DOE failed to account for significant, obvious macroeconomic events caused by the Covid-19 pandemic that undermine its cost-effectiveness analysis. Faced with its own data showing that the Final Rule's standards were not cost effective for thousands of low-income individuals who purchase multi-section manufactured homes, DOE buried its head in the sand by effectively concluding that these homebuyers simply do not exist. And DOE did not meet its statutory mandate to consult with HUD on the Final Rule.

As summarized by the Manufactured Housing Consensus Committee ("MHCC")—HUD's federal advisory committee on manufactured housing—after its review of the Final Rule:

> The MHCC has reviewed the DOE Final Rule and has determined DOE circumvented the standards development process prescribed in EISA which requires cost justification and consultation with HUD.
>
> DOE provided an energy conservation standard which was based on site-built construction and applied it to a performance-based national code. If adopted as written, the final rule would adversely impact [HUD's] entire Manufactured Housing program and cost increases associated with compliance would reduce prospective purchasers (especially minorities and low-income consumers) from durable, safe, high quality and affordable housing.

Admin. R., Doc. 2559, Attachment 11 (Ex. 3), at 1.

DOE contravened its enabling legislation and engaged in arbitrary and capricious rulemaking. Accordingly, summary judgment is warranted, and the Final Rule should be set aside.

<u>**STATEMENT OF UNDISPUTED FACTS**</u>

1.    In 2007, Congress passed the EISA, which directed DOE to promulgate energy efficiency standards for manufactured housing. 42 U.S.C. § 17071(a)(1). Congress imposed two critical requirements for this rulemaking.

2.    *First*, the EISA directs DOE to consult with HUD, who in turn may consult the MHCC. *See* 42 U.S.C. § 17071(a)(2)(B) (providing that the energy standards "shall be established after . . . consultation with the Secretary of Housing and Urban Development, who may seek further counsel from the Manufactured Housing Consensus Committee").

3.    The MHCC is a Federal Advisory Committee established by statute to provide recommendations to HUD on revisions and updates to the HUD Code. *See* 42 U.S.C. § 5403(a)(3). The MHCC is composed of twenty-one voting members, split evenly among representatives of manufacturers, consumer organizations, and public interest groups. *Id.* This composition is designed to "achieve a proper balance of interests" and to "ensure that all directly and materially affected interests have the opportunity for fair and equitable participation without dominance by any single interest." *Id.* HUD Code revisions, subject to the MHCC's review and recommendation process, include "preemptive energy conservation standards," which must be "cost-effective" and "ensure the lowest total of construction and operating costs." *Id.* § 5403(g).

4.    *Second*, similar to HUD's enabling legislation, the EISA requires DOE's energy standards to be "cost-effective," taking into account the economic impact on "the purchase price of manufactured housing and on total life-cycle construction and operating costs." 42 U.S.C.

§ 17071(b)(1). The standards are supposed to be "based on the most recent version of the International Energy Conservation Code (including supplements) ['IECC'], *except in cases in which the Secretary finds that the [IECC] is not cost-effective*." *Id.* (emphasis added).

5.    In its rulemaking, DOE acknowledged that the "need to maintain affordability" of manufactured housing "interrelate[s] with the considerations specified in 42 U.S.C. 17071" regarding cost-effectiveness. *See* Admin. R., Doc. 1999 (Ex. 2), at 9-2; 87 Fed. Reg. at 32,745, 32,749. Accordingly, one of DOE's stated goals in promulgating the Final Rule was to ensure that manufactured homes remain affordable to low-income purchasers. *See* 87 Fed. Reg. at 32,746 ("DOE believes that access to affordable housing and reducing energy burdens of the purchasers are of the utmost importance in the manufactured housing market.").

6.    In February 2010, DOE initiated the process of developing energy standards for manufactured housing with an advance notice of proposed rulemaking in which it solicited information and data from stakeholders. *See* 75 Fed. Reg. 7,556. DOE identified 13 distinct issues concerning energy efficiency in manufactured housing for which it sought public input. *See id.* at 7,557.

7.    After receiving and considering the submitted comments, DOE prepared a draft notice of proposed rulemaking that it submitted to the Office of Information and Regulatory Affairs ("OIRA"), as required for regulatory actions considered "significant." *See* Exec. Order No. 12,866, 58 Fed. Reg. 51,735. While the OIRA review process usually takes approximately 90 days, the OIRA review took over two years, after which the draft rule was withdrawn. *See* 83 Fed. Reg. 38,073, 38,074 & n.2 ("Ultimately, the draft NOPR did not clear the OIRA review process, and DOE withdrew it on March 13, 2014.").

8.    After OIRA's rejection of the draft rule, in June 2014, DOE decided to pursue these

standards through a negotiated rulemaking, determining that a consensual process with members of the industry would serve the "public interest" by availing itself of the expertise of "private-sector stakeholders and government officials who," unlike DOE, "are familiar with energy efficiency of manufactured housing." 79 Fed. Reg. 33,873, 33,875. Accordingly, DOE convened an "MH working group" to draft the initial standards pursuant to the Federal Advisory Committee Act and the Negotiated Rulemaking Act. *Id.* at 33,873. The MH working group was a subgroup under the Appliance Standards and Rulemaking Federal Advisory Committee ("ASRAC"). *Id.*

9.    The MH working group consisted of representatives from a diverse array of interested stakeholders with a directive to consult, as appropriate, a range of external experts on technical issues. *See* 79 Fed. Reg. 41,456. The MH working group consisted of 22 members, including representatives from multiple manufacturers, Plaintiff MHI, consumer advocacy groups, utilities, energy efficiency and environmental interest groups, component manufacturers and suppliers, and manufactured housing inspection agencies. *See id.* at 41,457. The MH working group also included one member from ASRAC and one DOE representative. *See id.* There was no HUD representative in the MH working group. *See id.*

10.    The MH working group met for a total of 12 days between August and October 2014. *See* 81 Fed. Reg. 39,756. On October 31, 2014, the MH working group reached a consensus on energy conversation standards for manufactured housing and assembled its recommendations for DOE into a term sheet. *See id.* ASRAC approved this term sheet and submitted it to DOE to develop a proposed rule. *See id.*

11.    During this same period, DOE sought further public comment regarding technical aspects of the rule, held numerous meetings with HUD, engaged in multiple discussions with the MHCC, and conferred with various other stakeholders. *See, e.g.*, 80 Fed. Reg. 7,550 (Feb. 11, 2015

Request for Information); 81 Fed. Reg. at 39,762–63 (noting "DOE attended three MHCC meetings, where DOE gathered information from MHCC members"); Admin. R., Doc. 119 (Ex. 4) (Feb. 23, 2015 letter from MHI regarding DOE's participation at winter meeting).

12.     In June 2016, DOE published a notice of proposed rulemaking based on the term sheet adopted by the MH working group and the years of comments and consultation it had had with HUD, the MHCC, and various stakeholders. 81 Fed. Reg. 39,756 (the "2016 Proposed Rule"). The 2016 Proposed Rule was "based on the 2015 edition of the International Energy Conservation Code" ("2015 IECC"). *Id.* Likewise, DOE's calculation of incremental costs imposed by the energy standards—that is, the cost of materials necessary to implement the proposed energy standards such as thicker insulation materials—also was based on the 2015 IECC and the industry cost estimates provided by the MH working group in 2014. *See, e.g.*, Admin. R., Docs. 90, 91 (Exs. 5, 6).

13.     In November 2016, DOE published another notice of proposed rulemaking to establish test procedures and compliance measures for the standards set forth in the 2016 Proposed Rule. *See* 81 Fed. Reg. 78,733. In the proposed testing rule, DOE explained, "[t]est procedures are necessary to provide for accurate, comprehensive information about energy characteristics of manufactured homes and provide for the subsequent enforcement of the standards. . . . The test procedure would therefore dictate the basis on which a manufactured home's performance is represented and how compliance with the proposed energy conservation standards, if adopted, would be determined." *Id.* at 78,734. Thus, DOE recognized the necessity of testing, compliance and enforcement procedures and planned to adopt specific testing procedures to govern the 2016 Proposed Rule's thermal envelope, air leakage, and fan efficacy requirements. *See id.*

14.     DOE submitted the 2016 Proposed Rule to OIRA, and the rule failed to clear the

OIRA review process for a second time. *See* 83 Fed. Reg. 38,073, 38,074–75 ("Again, however, DOE's draft final rule did not clear the OIRA review process and was withdrawn on January 31, 2017."). This withdrawal was due in part to Executive Order 13771, which required DOE to "manage the costs associated with the governmental imposition of private expenditures required to comply with Federal regulations," and further required that "any new incremental costs associated with new regulations shall, to the extent permitted by law, be offset by the elimination of existing costs associated with at least two prior regulations." *See* 82 Fed. Reg. 9,339.

15.    In December 2017, the Sierra Club filed suit against DOE to compel the agency to complete its energy standards rulemaking. *See Sierra Club v. Rick Perry*, Civil Action No. 1:17-cv-02700-EGS, Dkt. No. 1 (D.D.C. Dec. 18, 2017). DOE had never successfully promulgated any rule under the EISA for manufactured housing.

16.    In November 2019, DOE and the Sierra Club entered into a stipulated consent decree. *See id.* Dkt. No. 42. DOE agreed to publish a notice of proposed energy efficiency standards by May 14, 2021, and publish a final rule with those energy efficiency standards by February 14, 2022. *See id.* at 2–3. In February 2021, the parties agreed to an extension "to allow for the Administration of President Biden to review the previous Administration's work on this rulemaking." *See id.* Dkt. No. 45 at 2. Under the terms of the revised consent decree, DOE agreed to issue the proposed rule by August 16, 2021, and the final rule by May 16, 2022. *See id.*[1]

17.    In August 2021, DOE published a supplemental notice of proposed rulemaking in which it set out those proposed standards. *See* 86 Fed. Reg. 47,744 (the "2021 Proposed Rule"). Unlike the 2016 Proposed Rule, the 2021 Proposed Rule set forth standards based on a more recent, materially different version of the IECC, the 2021 edition ("2021 IECC"). *See id.*

---

[1] The consent decree was ultimately vacated in October 2022. *See id.* Dkt. No. 47.

18.     The rulemaking that emerged to resolve the *Seirra Club* litigation did not result in a continuation of the MH working group or any other meaningful collaboration with HUD or the industry. Despite the material differences between the 2021 and 2015 versions of the IECC, DOE did not reconvene the MH working group to assess those differences at any point during its rulemaking. In conducting its life-cycle cost ("LCC") analysis, DOE did not solicit updated industry cost data from the MH working group or any other source, instead choosing to rely on the same 2014 data, updated with a nominal 2.28% inflation factor, despite seismic economic changes to the manufactured housing industry following the Covid-19 pandemic. *See* 86 Fed. Reg. at 47,794 ("DOE proposes to maintain the component incremental costs used in the June 2016 NOPR and established by the MH working group."); *id.* at 47,798 ("DOE also updated all inputs to the LCC and [payback period] based on the updated AEO 2020," including "inflation rates.").[2] DOE also based its interest rate assumptions on the "data provided by the MH working group" in 2014. 86 Fed. Reg. at 47,792.

19.     In the 2021 Proposed Rule, DOE proposed to adopt "tiered" standards, imposing more stringent energy efficiency measures on manufactured homes with a "retail list price above $55,000." *See id.* at 47,746. The purported purpose of this tiered proposal was to "mitigate the potential adverse impacts of increased costs on manufactured housing affordability that may arise from increasing the stringency of energy efficiency requirements applied to manufactured homes." *Id.* at 47,754.

20.     During the public comment period, numerous stakeholders—including Plaintiffs—provided their concerns to DOE regarding its cost-effectiveness analysis, its tiered approach, and

---

[2] The referenced AEO 2020 report was published in January 2020. *See* 86 Fed. Reg. at 47,818 n. 81 (linking to https://www.eia.gov/outlooks/aeo/pdf/AEO2020%20Full%20Report.pdf.).

the apparent lack of consultation with HUD. For example, MHI explained that the 2021 Proposed

Rule "underestimate[ed] the current costs of homes and the costs of new materials," and TMHA

stated that DOE's use of "historical survey data" from 2014 failed to account for supply-chain

disruptions and rapidly increasing inflation. Admin. R., Doc. 1592 (Ex. 7), at 4; Admin R., Doc.

1628 (Ex. 1), at 2; *see also* Admin. R., Docs. 609, 669, 752, 754, 1839, 1972 (Exs. 8–13). MHI

explained how DOE's tiered system, then based on the price of the home, failed its "stated purpose

. . . to protect low-income families" by "exclud[ing from the market] significant numbers of low

income manufactured homebuyers" who purchase more expensive—but still affordable—

manufactured homes, *i.e.*, homes costing over $55,000. Admin. R., Doc. 1592 (Ex. 7), at 5–6; *see*

*also* Admin. R., Doc. 1612 (Ex. 14), at 3 ("All manufactured housing is based on affordability so

any attempt at setting price tiers to segregate based on affordability is contradictory."). MHI noted

that DOE had "offered no evidence that it utilized any of HUD's housing expertise that could have

led to a more informed rulemaking" in contravention of its mandate to consult HUD. Admin. R.,

Doc. 1592 (Ex. 7), at 10–11.

21.    DOE published the Final Rule on May 31, 2022. *See* 87 Fed. Reg. at 32,728. DOE

established two "tiers" of energy standards, one for single-section homes ("Tier 1") and one for

multi-section homes ("Tier 2"), both of which "are based on the 2021 IECC in that both tiers have

requirements for the building thermal envelope, duct and air sealing, installation of insulation,

HVAC specifications, service hot water systems, mechanical ventilation fan efficacy, and heating

and cooling equipment sizing provisions consistent with the 2021 IECC." 87 Fed. Reg. at 32,741.

22.    Rather than soliciting current and relevant cost data from the industry that could

have accounted for the economic disruptions over the preceding two years precipitated by the

Covid-19 pandemic, DOE continued to use the same 2014 MH working group data, which it

"corroborated" by looking to other obsolete, pre-2020 sources. *See id.* at 32,790 & n.65–66.

23.    DOE's own data showed that the Tier 2 standards were not cost effective for the majority of low-income families purchasing a multi-section home. *Compare* 87 Fed. Reg. at 32,756 (claiming the "tiered structure" will ensure "first-cost and affordability concerns were addressed") *with* Admin. R., Doc. 1999 (Ex. 2), at 9-5 (concluding that the average purchaser of multi-section housing who finances with a chattel loan <u>will lose money</u> over their tenure of ownership). The following table from DOE's Technical Support Document demonstrates that most purchasers of multi-section (Tier 2) manufactured homes utilizing chattel loans will lose money over their tenure of ownership:

Table 9.4 10-Year Analysis Period LCC Savings of Standards Compared to the HUD code for the Subgroup Analysis

| Climate Zone | City | LCC Savings 2020$ [1] | |
|:---:|:---|:---:|:---:|
| | | Tier 1 - Single-Section | Tier 2 - Multi-Section |
| 1 | Miami | $96.55 | ($530.33) |
| 1 | Houston | $363.73 | $62.00 |
| 1 | Atlanta | $705.10 | $784.45 |
| 1 | Charleston | $455.98 | $241.67 |
| 1 | Jackson | $580.11 | $574.35 |
| 1 | Birmingham | $582.72 | $506.37 |
| 2 | Phoenix | $177.01 | ($358.06) |
| 2 | Memphis | $679.49 | $30.06 |
| 2 | El Paso | $396.59 | ($187.60) |
| 2 | San Francisco | $123.82 | ($1,154.90) |
| 2 | Albuquerque | $429.10 | ($303.99) |
| 3 | Baltimore | $1,185.83 | $261.44 |
| 3 | Salem | $614.05 | ($759.93) |
| 3 | Chicago | $1,144.52 | $161.85 |
| 3 | Boise | $729.19 | ($483.23) |
| 3 | Burlington | $1,142.38 | $145.95 |
| 3 | Helena | $1,145.88 | $286.67 |
| 3 | Duluth | $1,956.37 | $1,663.69 |
| 3 | Fairbanks | $3,048.47 | $3,895.78 |
| | **National Average** [*] | **$720.48** | **($18.97)** |

* National average represents a shipment-weighted average based on fraction of national shipments presented in Table 10.2.
[1] Values in parenthesis are negative values.

Admin. R., Doc. 1999 (Ex. 2), at 9-5. In El Paso, Texas, for example, DOE itself projects that purchasers of multi-section homes with chattel loans will <u>lose</u> money as a result of the Final Rule.

24.    In response to comments that DOE failed to consult with HUD as required by the EISA, DOE asserted, without elaboration, that it had consulted HUD. *See* 87 Fed. Reg. at 32,757.

25.    The Final Rule initially mandated compliance with its standards by May 31, 2023,

before DOE had promulgated testing, compliance, or enforcement procedures. 87 Fed. Reg. at 32,728. DOE had previously acknowledged that such "procedures are necessary to provide for accurate, comprehensive information about energy characteristics of manufactured homes and provide for the subsequent enforcement of the standards." 81 Fed. Reg. at 78,734.[3] But in order to get the Final Rule published before the consent decree's deadline, DOE deferred this "necessary" aspect of its rulemaking to an indeterminate "future action on test procedures." 87 Fed. Reg. at 32,757. Thus, it is undisputed that DOE did not incorporate the substantial costs of testing, compliance, and enforcement into its cost-effectiveness analysis.

26.    In October and November of 2022, the MHCC convened to review the Final Rule and propose recommendations on whether HUD should incorporate the Final Rule's energy efficiency measures into the HUD Code. Admin. R., Doc. 2559, Attachment 11 (Ex. 3). The MHCC concluded that HUD *should not* follow DOE's Final Rule and instead proposed different standards. *See id.* The MHCC "determined DOE circumvented the standards development process prescribed in EISA which requires cost justification and consultation with HUD," and that if HUD adopted the Final Rule, it "would adversely impact the entire Manufactured Housing program and cost increases associated with compliance would reduce prospective purchasers (especially minorities and low-income consumers) from durable, safe, high quality and affordable housing." *Id.* at 1. The MHCC also noted that DOE rejected its prior "recommend[ation] that DOE include the substantial cost of testing, enforcement, and regulatory compliance in its costing analysis," and that DOE had created "a gap in enforcement." *Id.* at 2.

27.    On February 14, 2023, Plaintiffs filed the instant action challenging the Final Rule

---

[3] Building standards and enforcement standards go hand-in-hand in the manufactured housing industry. For example, when HUD promulgated the HUD Code in 1976, it issued both building standards (24 C.F.R. § 3280) and complimentary enforcement standards (24 C.F.R. § 3282).

and simultaneously filed its Motion to Stay Agency Action based in part on DOE's demand that manufacturers comply with the Final Rule before DOE had even adopted a rule for measuring compliance. *See* Dkt. No. 5. Plaintiffs argued that DOE had ignored its prior conclusion that testing "procedures are necessary," *see id.*, and that their absence from the Final Rule would force manufacturers to "guess about the appropriate protocols to follow." *See* Dkt. No. 35 at 8.

28.    In response, DOE conceded to Plaintiffs' common sense point that compliance should not be required until DOE issued rules explaining how it would evaluate such compliance. On March 24, 2023, DOE published a notice of proposed rulemaking to delay the compliance date until after DOE published its final enforcement procedures. *See* 88 Fed. Reg. 17,745. DOE acknowledged that delaying the compliance date was "necessary" to "provide clarity to manufacturers and consumers regarding DOE's means of enforcing the standards and how DOE will evaluate compliance." *Id.* at 17,746.

29.    On May 30, 2023, DOE finalized this delay rule, extending the compliance deadlines "until 60 days after DOE's publication of its final enforcement procedures for the Tier 1 standards, and until July 1, 2025, for the Tier 2 standards." 88 Fed. Reg. 34,411, 34,418.

30.    As of the date of this filing, DOE has still not published its final enforcement procedures for any of its energy efficiency standards.

## **PROCEDURAL HISTORY**

On August 11, 2023, Plaintiffs filed the FAC. *See* Dkt. No. 48. DOE moved to dismiss for lack of subject matter jurisdiction, claiming that Plaintiffs' claims were not ripe until DOE had completed its enforcement rulemaking. *See* Dkt. No. 49. The Court denied DOE's motion as to all but one claim. *See* Dkt. No. 58 at 10–11 (finding Plaintiffs' claims that DOE failed to consult HUD, understated actual costs, and ignored affordability concerns for low-income purchasers would "not

be cured by any further factual development").

On July 1, 2024, DOE certified the administrative record. *See* Dkt. No. 71-1, 71-2 ("Administrative Record"). To this filing, DOE also attached the declaration of DOE employee Ashley Armstrong, who listed a series of meetings and communications with HUD to bolster DOE's claim that it engaged in the EISA-required consultation with HUD. *See* Dkt. No. 71-3 ("Armstrong Declaration"). Plaintiffs moved to strike this declaration as an improper attempt to circumvent the standards for supplementation. *See* Dkt. No. 72. After Magistrate Judge Susan Hightower denied Plaintiffs' motion, Plaintiffs filed a motion for reconsideration, which remains pending before the Court. *See* Dkt. No. 81.

On August 30, 2024, Plaintiffs moved to supplement the Administrative Record with the Darling Declaration as necessary background information to evaluate whether DOE failed to consider the historic economic environment in which it conducted its rulemaking and the significance of this failure on DOE's adoption of the Final Rule. *See* Dkt. No. 79; Dkt. No. 89.

The Darling Declaration provides important background information to assist the Court in evaluating DOE's contention that it considered all relevant factors in its rulemaking. For example, whether DOE's purported attempt to "corroborate" its 2014 cost data actually addressed commenters' concerns that DOE was ignoring the extraordinary inflation in the construction industry precipitated by the Covid-19 pandemic. In that regard, DOE claimed to have "reviewed the RS Means *2020* and concluded that the estimates by the MH working group continued to remain mostly relevant." 87 Fed. Reg. at 32,790 (emphasis added). However, RS Means *2022*, which was published prior to DOE's adoption of the Final Rule, made clear that construction costs had radically escalated due to the effects of inflation: "The construction industry has never seen anything like the past two years. Material price hikes. Supply chain bottlenecks. Skilled labor

shortages. Budgets have gone through the roof. Projects have been halted by material scarcities. And market uncertainty has reduced the shelf life for bids and estimates from weeks to days." Dkt. No. 89-1 at 26–27.

The Darling Declaration also provides crucial background information on the importance of this issue and its relevance to the Final Rule. The Darling Declaration shows that if DOE had sourced updated cost and interest rate data, as Plaintiffs and other commenters requested, its positive LCC conclusions could be reversed. *See* Dkt. No. 89-1 at 34. Specifically, for purchasers of multi-section homes using personal property loans, *i.e.*, the lowest-income consumers most in need of affordable housing, a staggering 98% could lose money over their tenure of ownership as a result of the Final Rule. *See id.* at 38. Additionally, DOE acknowledged the importance of ensuring the costs of its Final Rule would not be disproportionately borne by minority populations, yet because of DOE's failure to update its data, that is precisely what the Final Rule does. *See id.* at 40–42. Despite DOE's recognition that its cost-effectiveness analysis required by the EISA must account for the importance of manufactured homes as a source of affordable housing, DOE's failure to account for contemporaneous economic realities could result in over 223,000 fewer sales of manufactured homes over the next thirty years. *See id.* at 48.

Notwithstanding Plaintiffs' satisfaction of the standard for supplementation, Magistrate Judge Hightower denied Plaintiff's motion to supplement the Administrative Record with the Darling Declaration. *See* Dkt No. 88. Plaintiffs' motion for reconsideration of this order also remains pending before the Court. *See* Dkt. No. 89.

## <u>STANDARD OF REVIEW</u>

Under the APA, courts must hold unlawful and set aside any agency action that is "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right" or "without

observance of procedure required by law." 5 U.S.C. § 706(2)(C)–(D). The APA also directs courts to hold unlawful and set aside agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Id.* § 706(2)(A). Agency action is arbitrary and capricious when the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, [or] offered an explanation for its decision that runs counter to the evidence before the agency[] or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). In evaluating whether the agency failed to consider any relevant factor, the Court "must make a searching and careful inquiry to determine if [the agency] actually *did* consider it." *Texas v. United States*, 40 F.4th 205, 228 (5th Cir. 2022) ("Stating that a factor was considered . . . is not a substitute for considering it.").

Summary judgment is warranted where, as here, there is no genuine dispute as to any material fact and Plaintiffs are entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a); *see Pratt v. Harris Cty.*, 822 F.3d 174, 180 (5th Cir. 2016) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)); *see also Girling Health Care, Inc. v. Shalala*, 85 F.3d 211, 214 (5th Cir. 1996) ("We have consistently upheld, without comment, the use of summary judgment as a mechanism for review of agency decisions.").

## ARGUMENT

For three independent reasons, the Final Rule is unlawful and due to be set aside. *First*, in performing the EISA-required, cost-effectiveness analysis, DOE failed to consider the historic, post-pandemic economic environment in which DOE conducted its rulemaking. *Second*, DOE arbitrarily ignored its own data showing that the energy standards are not cost effective for low-income families purchasing multi-section homes. *Third*, DOE failed to consult with HUD as

mandated by the EISA.

## I. DOE Failed to Consider Material Economic Realities in Promulgating the Final Rule.

Under the EISA, DOE must ensure that the standards it adopts are cost effective. *See* 42 U.S.C. § 17071. To perform this analysis, DOE attempted to calculate the LCC that will result from its new energy standards. *See* 87 Fed. Reg. at 32,742. The LCC model calculates energy savings a consumer will receive (*i.e.*, lower energy bill) over a given period of time and subtracts the increased purchase costs arising from those standards (*i.e.*, higher home price). If the resulting number is positive, then the energy standards are deemed to be cost effective. If negative, then the energy standards are not cost effective.

In conducting this analysis, DOE had an obligation to ensure it was evaluating all of the relevant costs associated with its rulemaking. *See Business Roundtable v. SEC*, 647 F.3d 1144, 1152 (D.C. Cir. 2011) ("By ducking serious evaluation of [certain] costs," the agency "acted arbitrarily."). However, in its rush to meet a court ordered deadline to complete its rulemaking, *see supra* at 9–10, DOE chose to ignore an inconvenient truth: the economic landscape generally— and its effects on the manufactured housing construction industry specifically—had radically shifted between 2014, when it sourced its cost and interest rate data, and May 2022, when it published the Final Rule. Supply chain disruptions and material price increases had radically upset the relative stability of pre-pandemic construction costs, as many commenters noted. *See supra* at 11. Rapid inflation precipitated interest rate hikes, as the Federal Reserve indicated. *See infra* at 21–22. By "fail[ing] to consider [this] important aspect of the problem" in promulgating the Final Rule, DOE acted arbitrarily and capriciously, requiring the Final Rule to be set aside. *State Farm*, 463 U.S. at 43; *see also Dow AgroSciences LLC v. Nat'l Marine Fisheries Serv.*, 707 F.3d 462, 473 (4th Cir. 2013) (refusing to "silently rubber stamp agency action that is arbitrary and capricious in its reliance on old data without meaningful comment on the significance of more current compiled

data").

### A. DOE ignored historic inflation and substantial construction cost increases.

Mandating additional energy efficiency measures (such as thicker insulation) increases the materials cost of a home and the resulting purchase price. To calculate this increased purchase price, DOE arbitrarily relied upon the MH working group's *2014* cost estimates and then assumed an annual inflationary increase of *2.28%* to arrive at current dollars. *See* 87 Fed. Reg. at 32,788 ("DOE based the incremental costs on those costs provided and agreed to by the [2014] MH working group."); Admin. R., Doc. 1999 (Ex. 2), at 11-3 ("To forecast the nominal price increase of manufactured homes, DOE used the inflation forecast rate built into the AEO 2021, 2.28 percent."); Admin. R., Doc. 1996.[4]

However, as was well-known at the time DOE published the Final Rule, the cost of construction materials exploded because of the Covid-19 pandemic and the resulting inflation and supply-chain disruptions. Numerous commenters, including Plaintiffs, identified this glaring omission from DOE's cost-effectiveness analysis. *See, e.g.*, Admin. R., Doc. 1592 (Ex. 7), at 4; Admin. R., Doc. 1628 (Ex. 1), at 2. They encouraged "DOE to work directly with the producers of manufactured homes to validate the construction cost numbers used in the cost effectiveness analysis" because "material costs have increased substantially over the last two years." *See* Admin. R., Doc. 1398 (Ex. 15), at 2. Indeed, construction cost materials *increased by 35.1%* in just one year, between 2020 and 2021. *See* Admin. R., Doc. 2559, Attachment 3, Sub-Exhibit 5 (Ex. 21), at 32.[5]

---

[4] Excel file available at: https://www.regulations.gov/document/EERE-2009-BT-BC-0021-1996.

[5] This document from the Administrative Record is an earlier version of the Darling Declaration that Plaintiff MHI submitted with its comments to the delay rule. *See* Dkt. No. 92 at 14 (DOE stating that "the information in the Darling Report is already in the administrative record").

Because of its truncated rulemaking process to meet deadlines imposed by the *Sierra Club* litigation, DOE did not seek out current cost data as requested by the commenters. Instead, DOE purported to "corroborate" its 2014 cost data by looking to other outdated cost sources. *See* Admin. R., Doc. 1999 (Ex. 2), at 5-2 (asserting "DOE reviewed the 2020 RS Means construction cost estimating software to corroborate this cost data," as well as the "2021 IECC," "American Society of Heating, Refrigeration, and Air Conditioning Engineers (ASHRAE)," and "costs provided in response to the June 2016 NOPR"); 87 Fed. Reg. at 32,790 & n.65–66 (similar). However, none of these purportedly corroborative sources encompass the relevant economic period flagged by commenters. The *2020* RS Means, of course, did not capture the historic inflation that occurred in 2021 and early 2022. The referenced 2021 IECC report relies on the same 2020 RS Means data (as well as data from 2012). *See* 87 Fed. Reg. at 32,790 n.65; Admin. R., Doc. 2583 (Ex. 16), at 12. The referenced ASHRAE report was prepared in May of *2009*. *See* 87 Fed. Reg. at 32,790 n.66; Admin. R., Doc. 2584 (Ex. 17), at 1.

Moreover, as explained in Plaintiffs' Motion for Reconsideration as to the Darling Declaration, *see* Dkt. No. 89, the Court should supplement the Administrative Record with the Darling Declaration, which provides additional background information on the 2020 RS Means that will allow the Court to determine whether, through this purported "corroboration" methodology, DOE actually considered the issue. *See Medina Cnty. v. Surface Transp. Bd.*, 602 F.3d 687, 706 (5th Cir. 2010) (holding supplementation is proper where the "district court need[s] . . . 'background information' in order to determine whether the agency considered all of the relevant factors"); *Texas*, 40 F.4th at 228 (holding courts "must make a searching and careful inquiry to determine if [the agency] actually *did* consider" the relevant issue). The Darling Declaration explains that the *2022* RS Means, which was available when DOE published the Final

Rule, shows that certain materials costs rose 106% after the publication of the 2020 RS Means on which DOE relied. *See* Dkt. No. 89-1 at 26.

In any event, it is undisputed that none of these sources capture the historic inflation that occurred in 2021 and 2022; nor did the "costs provided by stakeholders in response to the June *2016* NOPR." Admin. R., Doc. 1999 (Ex. 2), at 5-2. By relying on obsolete cost data to justify its continued use of other obsolete cost data, DOE ignored the substantive issue raised by commenters and "failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43.

### B.  DOE ignored substantial interest rate hikes.

In assessing financing for manufactured homes—which is one component of DOE's LCC analysis—DOE assumed that real estate loans would have a 5% interest rate and personal property, or chattel, loans would have a 9% interest rate. *See* 87 Fed. Reg. at 32,785. However, by the time DOE published the Final Rule in May of 2022, the Federal Reserve had already begun substantial interest rate hikes that severely undermined the financing assumptions in DOE's LCC analysis. In two meetings held before DOE published the Final Rule, the Federal Reserve increased interest rates and said that it "anticipated that ongoing increases in the target rate range would be appropriate."[6] Indeed, average mortgage interest rates for all real estate loans had increased to 6.3% by the time of the initial compliance date and reached a peak of 7.8%. *See* Doc. 89-1 at 27–29; Admin. R., Doc. 2559 Attachment 3, Sub-Exhibit 5 (Ex. 21), at 35–37. These rate hikes were

---

[6] "Minutes of the Federal Open Market Committee," Board of Governors of the Federal Reserve System, March 15–16, 2022, at 11, *available at* https://www.federalreserve.gov/monetarypolicy/files/fomcminutes20220316.pdf; "Minutes of the Federal Open Market Committee," Board of Governors of the Federal Reserve System, May 3–4, 2022, at 10, *available at* https://www.federalreserve.gov/monetarypolicy/files/fomcminutes20220504.pdf. The Court may take judicial notice of these publications pursuant to Fed. R. Evid. 201(b)(2). *See Cicalese v. Univ. of Texas Med. Branch*, 456 F. Supp. 3d 859, 871 (S.D. Tex. 2020) ("[G]overnmental websites are proper sources for judicial notice.").

even more pronounced for manufactured housing loans, which DOE acknowledges "tend to have smaller loan amounts, higher interest rates, fewer refinances, and less of a secondary market, patterns that are even more acute for chattel loans," the most common form of financing for manufacture homes. 87 Fed. Reg. at 32,742; *see also* Admin. R., Doc. 1999 (Ex. 2), at 8-3, 8-4 (Technical Support Document noting that interest rates for chattel loans are typically "5 percentage points greater than real estate loans").

Despite these clear trends, DOE maintained its prior interest rate assumptions from the proposed rule, which it again purported to corroborate with another outdated source. *See* 87 Fed. Reg. at 32,785 ("[T]he loan interest rates DOE is using (5 percent for consumers using real estate loans, 9 percent for consumers using chattel or personal property loans) is consistent with the rates used in the 2021 CFPB report (4.6 percent for mortgage/real estate loans and 8.6 percent for chattel loans)."). The 2021 CFPB report was published in May 2021 and "relies primarily on 2019 HMDA data." *See* Admin. R., Doc. 2572 (Ex. 18), at 11 n.24. That report notes that interest rates were "falling . . . during 2019." *Id.* at 21. Accordingly, this purportedly corroborative source, published before the interest rate hikes at issue and relying on pre-pandemic data, could not account for the dramatic increases in financing costs that began in 2022 before publication of the Final Rule.

### C. DOE's disregard of material economic realities was arbitrary and capricious.

Agency action has been held unlawful where, as here, the agency relies on stale data and fails to take into account important economic realities and changes to the relevant industry. *See Gas Appliance Mfrs. Ass'n, Inc. v. Dep't of Energy*, 998 F.2d 1041, 1047–48 (D.C. Cir. 1993) (holding that DOE's used an "arbitrary multiplier" to determine cost of insulation); *La. State v. Dep't of Com.*, 559 F. Supp. 3d 543, 547–48 (E.D. La. 2021) (agency "failed to consider the difficulty . . . complying with the Final Rule in light of the COVID-19 pandemic").

For example, in *Dow*, the Fisheries Service relied upon water monitoring data from 1992 to 2006 in promulgating a 2008 biological opinion that concluded current pesticide levels would adversely affect critical habitats. *See* 707 F.3d at 466, 470. However, in the intervening period, the EPA adopted new mitigation measures that decreased the use of these pesticides. *See id.* at 472. Several commenters "promptly noted the flaws" in relying upon the historic survey data and "directed the Fisheries Service to more recent available data." *Id.* Nevertheless, the Fisheries Service continued to rely on the old data, asserting that the "mitigation measures did not mean that pesticide use necessarily changed" and noting that the effect of these measures "was uncertain." *Id.* at 473. The court rejected this argument because "not one of the explanations addresses the issue of why the Fisheries Service relied on these old data when new data were available." *Id.* The court found that it could "not silently rubber stamp agency action that is arbitrary and capricious in its reliance on old data without meaningful comment on the significance of more current compiled data." *Id.* (quoting *Sierra Club v. EPA*, 671 F.3d 955, 968 (9th Cir. 2012)).

The Final Rule exhibits the same arbitrary decision making. DOE relied on a historic cost survey from 2014 to estimate the costs associated with the Final Rule it published in 2022. Numerous commenters promptly noted this issue and directed DOE to more recent sources. DOE ignored these comments and instead chose to "bolster the reliability of the data it actually used" by citing other outdated sources. *Dow*, 707 F.3d at 473; *see also* 87 Fed. Reg. at 32,790. Thus, the Final Rule is "arbitrary and capricious in its reliance on old data without meaningful comment" when "more recent data" was readily available. *Dow*, 707 F.3d at 473.

Plaintiffs' challenge in this regard is not a "mere disagreement[] with DOE's methodology, cost inputs, and analysis." *See* Dkt. No. 32 at 15. In normal circumstances, DOE's decision to use historic cost data and a nominal inflation rate might have been perfectly reasonable. Indeed, DOE's

cost assumptions largely tracked actual cost increases *until* the start of the Covid-19 pandemic, after which the cost of the energy efficiency measures sharply increased:



Figure 2: Estimated Costs of Energy Efficiency Measures for Multi-Section Homes, by Inflation Adjustment Approach and Climate Zone, 2014-2023

*See* Doc. 89-1 at 23; Admin. R., Doc. 2559, Attachment 3, Sub-Exhibit 5 (Ex. 21), at 33. However, extraordinary circumstances, identified by numerous commenters, required DOE to "at the very least, analyze the new data or explain why it nevertheless chose to rely on the older data." *Dow*, 707 F.3d at 473. DOE did neither and instead cited other pre-pandemic data sources that failed to address the substantive issue. *See Mexican Gulf Fishing Co. v. United States Dep't of Com.*, 60 F.4th 956, 973 (5th Cir. 2023) ("[The APA] standard of review does not grant the Government free license to interpret comments in a manner that ducks the hard questions. Indeed, too much deference would essentially allow the Government to bury its head in the sand. The Administrative Procedure Act demands more than this."); *Dow*, 707 F.3d at 473 (rejecting agency explanation that fails to "addresses the issue of why the [agency] relied on these old data when new data were available").

    If DOE had substantively addressed the cost-effectiveness concerns raised by commenters

and actually considered the economic realities in which it conducted its rulemaking, it certainly could have affected DOE's adoption of the Final Rule. *See Huawei Techs. USA, Inc. v. Fed. Commc'ns Comm'n*, 2 F.4th 421, 451 (5th Cir. 2021) (comments are "significant" and require a substantive response when the issue raised is "'[]capable of affecting' the rule the agency ultimately adopted"). DOE's LCC analysis was critical to its adoption of the Final Rule. *See* 87 Fed. Reg. at 32,772 ("DOE has determined that the adopted Tier 2 requirements are cost-effective because of the positive LCC savings over the life of the manufactured home for both the nation, and every city analyzed."). However, if DOE had accounted for the economic realities in which it conducted its rulemaking by sourcing actual cost data and current interest rates, its LCC findings could be reversed for most multi-section home purchasers. As seen in the below table, updating DOE's LCC inputs to account for materials cost increases and interest rate hikes shows that DOE overestimated average savings by $856 and that 60% of multi-section homebuyers will lose money over their tenure of ownership:

**Table 5: 10-year DOE and Adjusted LCC Values, by Home Size**

|  | Single-section | Multi-section |
|---|---|---|
| DOE LCC | $720 | $743 |
| Adjusted LCC | $633 | -$112 |
| Difference | -$88 | -$856 |
| % Change | -12% | -115% |
| Number of Cities with Negative LCC | 1/19 | 9/19 |
| % Shipments with Negative LCC | 6% | 60% |

*See* Dkt. No. 89-1 at 34; Admin. R., Doc. 2559, Attachment 3, Sub-Exhibit 5 (Ex. 21), at 41.

A negative LCC demonstrates that the purchasers in question are expected to lose money as a result of the Final Rule over their tenure of ownership, meaning the standard is not cost effective as required by the EISA. When DOE calculated a negative LCC for just one city, it amended the energy efficiency standards to make the result positive. *See* 87 Fed. Reg. at 32,769

("Therefore considering at least one city during the 30-year analysis in Tier 2 resulted in negative LCC savings with R-20+5 exterior wall insulation, in this final rule, DOE is adopting the next stringent insulation, R-21 for Tier 2."). This response demonstrates the centrality of the EISA-required, cost-effectiveness analysis to DOE's rulemaking. Materials cost increases and interest rates hikes are economic realities that affect DOE's LCC analysis for every standard in the Final Rule nationwide, and to engage in valid rulemaking, DOE needed to consider these economic realities. DOE's decision to ignore the economic realities so integral to its own rulemaking was arbitrary and capricious. *State Farm*, 463 U.S. at 43.

## II.    DOE Arbitrarily Ignored Affordability Concerns and Offered Explanations Counter to the Evidence Before It.

One of DOE's stated goals in promulgating the Final Rule is to ensure that manufactured housing remains affordable for low-income purchasers. *See* 87 Fed. Reg. at 32,746. DOE found that such affordability considerations "interrelate" with DOE's cost-effectiveness analysis. *See* Admin. R., Doc. 1999 (Ex. 2), at 9-2; 87 Fed. Reg. at 32,745, 32,749. Thus, DOE acknowledges, as it must, that its new standards should be cost effective for low-income purchasers for whom affordability is of paramount importance. Yet, DOE flatly ignored *its own data*, which shows that the energy standards are not cost effective for low-income families purchasing a multi-section (Tier 2) home.

In the Technical Support Document for the Final Rule, DOE found (1) that 78% of all manufactured home purchases are financed with a chattel (personal property) loan and (2) that low-income families typically use chattel loans to finance their purchase. *See* Admin. R., Doc. 1999 (Ex. 2), at 6-1, 8-3. Significantly, DOE's own cost-effectiveness model found that if a multi-section home is financed with a chattel loan, then the energy standards are <u>not</u> cost effective—that is, using the national average, such purchasers will *lose* money over a 10-year period as a result of

the Final Rule. *See id.* at 9-5; *see supra* at 12.

Accounting for the economic realities that DOE ignored, *see supra* at 18–26, the results are even worse. A staggering *98%* of borrowers purchasing a multi-section home with a personal property loan could incur a net loss, on average losing $892 over their tenure of ownership:

Table 6: 10-year LCC for Multi-Section Manufactured Homes Financed with a Personal Property Loan

| City | Original DOE analysis | Adjusted DOE analysis with updated assumptions |
|---|---|---|
| San Francisco | -$1,155 | -$2,083 |
| Salem | -$ 760 | -$1,566 |
| Miami | -$ 530 | -$1,466 |
| Phoenix | -$ 358 | -$1,326 |
| Boise | -$ 483 | -$1,271 |
| Albuquerque | -$ 304 | -$1,194 |
| El Paso | -$ 188 | -$1,155 |
| Memphis | $ 30 | -$ 916 |
| Houston | $ 62 | -$ 839 |
| Charleston | $ 242 | -$ 648 |
| Baltimore | $ 261 | -$ 597 |
| Chicago | $ 162 | -$ 559 |
| Burlington | $ 146 | -$ 500 |
| Helena | $ 287 | -$ 431 |
| Birmingham | $ 506 | -$ 369 |
| Jackson | $ 574 | -$ 301 |
| Atlanta | $ 784 | -$ 79 |
| Duluth | $1,664 | $1,074 |
| Fairbanks | $3,896 | $3,417 |
| **National Average** | -$ 19 | -$ 892 |
| Number of cities with negative LCC | 7 | 17 |
| Percent shipments with negative LCC | 37% | 98% |

*See* Dkt. No. 98-1 at 38; Admin. R., Doc. 2559, Attachment 3, Sub-Exhibit 5 (Ex. 21), at 52.

Instead of amending the standards to address the fact that its Tier 2 standards are not cost effective for those most in need of affordable housing, DOE sought to explain this result away by claiming that low-income consumers do not "purchase multi-section homes because multi-section homes are generally more expensive." Admin. R., Doc. 1999 (Ex. 2) at 9-3.[7] Thus, DOE concluded that it did not need to consider affordability concerns at all for Tier 2 purchasers, essentially granting itself permission to tolerate a negative LCC for these purchasers. *See, e.g.*, 87 Fed. Reg. at 32,751 ("DOE believes this approach addresses the concerns raised by HUD and other

---

[7] In this way, DOE's Tier 1 / Tier 2 dichotomy "assumes" that low-income homebuyers do not have large families that would require multi-section homes. Of course, this assumption ignores the common circumstance of larger families purchasing lower-cost, multi-section homes.

stakeholders regarding affordability as low-income purchasers, *whom DOE considered in developing Tier 1 standards . . .*") (emphasis added); *id.* at 32,748 ("DOE only considered the effect of [debt-to-income] on the Tier 1 standard because commenters were focused on how the energy conservation standards could affect DTI on low-income consumers who have higher DTIs and affordability concerns.").

DOE did not elaborate on its arbitrary assumption that low-income households do not purchase multi-section homes. Indeed, the economic studies cited in the Final Rule belie DOE's self-serving explanation and demonstrate that thousands of low-income families ***do*** purchase multi-section homes. The 2019 American Housing Survey concluded that <u>45%</u> of multi-section occupants fall below 200 percent of the Federal Poverty Level—or $59,900 in annual income for a family of four in 2022. *See* 87 Fed. Reg. at 32,750; Admin. R., Doc. 2574 (Ex. 19) (United States Census Poverty Thresholds).[8] HUD defines "low-income" as 80% of median income—or $72,000 in 2022.[9] Thus, DOE's own data shows that a substantial percentage of multi-section purchasers— likely a significant majority—are low-income and would lose money as a result of the Final Rule.

DOE's decision to ignore affordability concerns for Tier 2 purchasers, premised on its unsubstantiated conclusion that "low-income families do not purchase multi-section homes," was arbitrary and capricious. *State Farm*, 463 U.S. at 43 (agency conclusions cannot "run[] counter to the evidence before the agency"). Courts routinely set aside agency actions where the data before the agency undermines its conclusions and explanations. *See, e.g.*, *Greater Yellowstone Coalition,*

---

[8] Excel available at: www.census.gov/data/tables/time-series/demo/income-poverty/historical-poverty-thresholds.html.

[9] *See* Admin. R., Doc. 1617 (Ex. 20), at 4 (commenter providing HUD definitions); "Methodology for Calculating FY 2022 Medians," Dept. of Housing and Urban Development, at 9, *available at* https://www.huduser.gov/portal/datasets/il/il22/Medians-Methodology-FY22.pdf (finding national median family income was $90,000 in 2022); *see also Cicalese*, 456 F. Supp. 3d at 871.

*Inc. v. Servheen*, 665 F.3d 1015, 1024–26 (9th Cir. 2011) (agency's conclusion that 25% whitebark pine declines were "not a threat" to the grizzly population despite also identifying whitebark as "important to grizzly bear survival" was arbitrary and capricious); *Texas v. Biden*, 589 F. Supp. 3d 595, 619 (N.D. Tex. 2022) (holding agency decision to exempt unaccompanied children from infection disease expulsion process was arbitrary and capricious because "CDC's own findings" showed that 15,000 had been diagnosed with Covid-19). This is especially true where the agency "ignores contradictory relevant evidence regarding a critical factor in its decision." *New Life Evangelistic Ctr., Inc. v. Sebelius*, 672 F. Supp. 2d 61, 74 (D.D.C. 2009). DOE's willful disregard of its own cost-effectiveness data for multi-section, low-income homebuyers was arbitrary and capricious.

Moreover, the harm from DOE's failure in this regard will be disproportionately borne by minority homebuyers, who are also far more likely to use chattel loans. *See* Admin. R., Doc. 2559, Attachment 3, Sub-Exhibit 5 (Ex. 21), at 51 (noting that Hispanic households are 33 percent more likely to use personal property loans and Black households are at least 67 percent more likely to use chattel loans). Additionally, DOE's arbitrary decision to ignore affordability concerns for Tier 2 purchasers exacerbates the Final Rule's negative effects on the availability of affordable housing, as the Final Rule could result in over 223,000 fewer sales of manufactured homes over the next thirty years, depriving access to homeownership for hundreds of thousands of Americans. *See supra* at 16.

## III.  **DOE Failed to Consult with HUD in Violation of the EISA.**

The EISA mandates that DOE promulgate its energy standards for manufactured housing in "consultation with the Secretary of [HUD], who may seek further counsel from the [MHCC]." 42 U.S.C. § 17071(a)(2)(B). DOE neglected this statutory requirement as well.

The HUD consultation requirement serves a clear purpose: to ensure that DOE—a

newcomer to the regulation of manufactured housing—benefits from the expertise of HUD. Yet, in the Final Rule, DOE did not provide any evidence that it consulted with HUD regarding the standards therein. DOE's conclusory comment in the Final Rule that it satisfied this obligation should be rejected. *See* 87 Fed. Reg. at 32,757. "When a statute specifically requires an agency to consult with an outside entity during the course of a rulemaking, the administrative record should contain *some evidence* that such a consultation took place." *FBME Bank Ltd v. Lew*, 209 F. Supp. 3d 299, 323 (D.D.C. 2016) (emphasis added); *see also Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 121 (1st Cir. 2002) (reversing judgment in agency's favor where there was "insufficient evidence in the record to show that the Secretary complied with Congress' explicit procedural requirement to consult with the appropriate councils").

The only specific reference to consultation with HUD in the Final Rule relates to DOE's *2016* Proposed Rule, which was based on the *2015* IECC, not the *2021* IECC. *See, e.g.*, 87 Fed. Reg. at 32,737–38. The 2016 Proposed Rule was developed in conjunction with the MH working group, a body of interested stakeholders, which DOE did not reconvene when developing the Final Rule. *See supra* at 7–10. When Congress mandates consultation, the consultation must address the specific rulemaking at issue, not a proposed rulemaking regarding a different set of standards. *See Nat'l Constructors Assoc. v. Marshal*, 581 F.2d 960, 971 (D.C. Cir. 1978) ("[A]dvisory committee consultation should . . . consist of something more than a single and brief rest stop on the route between a tentative proposal of one construction health and safety standard, and the final promulgation of another, superficially related, but substantively quite different, standard.").

In an attempt to correct this deficiency, DOE attached the Armstrong Declaration—drafted years after DOE promulgated the Final Rule—to the Administrative Record. *See* Dkt. No. 71-3. For all the reasons set forth in Plaintiffs' Motion for Reconsideration related to the Armstrong

Declaration, *see* Dkt. Nos. 81, 87, the Court should strike the Armstrong Declaration from the Administrative Record as *post hoc*, litigation-driven testimony.

Regardless, the Armstrong Declaration does not supply meaningful evidence of consultation either. "Consultation" means the "act of asking the advice or opinion of someone." *Campanale*, 311 F.3d at 117 (quoting BLACK'S LAW DICTIONARY (7th ed. 1999)); *see also California Wilderness Coal. v. U.S. Dep't of Energy*, 631 F.3d 1072, 1087 (9th Cir. 2011) ("An ordinary meaning of the word consult is to 'seek information or advice from []someone with expertise in a particular area.'"). The necessity of meaningful consultation is "greatest when," as here, "the agency is tasked with adopting a 'novel approach' that will then affect all stakeholders." *California Wilderness*, 631 F.3d at 1094; *see also* Admin. R., Doc. 2559, Attachment 11 (Ex. 3), at 1 (MHCC concluding that "DOE circumvented . . . consultation with HUD").

The Armstrong Declaration statements about purported meetings between DOE and HUD fail to demonstrate that DOE actually sought HUD's "advice or opinion" as to the proposed energy standards for manufactured housing. For example, half of the identified communication with HUD concern "discussion[s] on manufactured housing," "coordination on manufactured housing rulemaking," or "manufactured housing policy issues" generally, not the Final Rule. Dkt. No. 71-3 at 5–7 (bullets 4–6, 8, 9, 13–15). General policy discussions, untethered from the Final Rule, are not "consultation" as mandated by the EISA. *See Campanale*, 311 F.3d at 119–20 (finding lack of consultation because correspondence merely "involve[d] general discussions about management of the lobster fishery rather than specific views about the proposed conservation measures"). Moreover, the remaining descriptions fail to explain how DOE discharged its statutory consultation requirement to solicit advice or an opinion from HUD. *Id.* ("The Secretary does not proffer any evidence in the administrative record where NMFS affirmatively solicits advice or an opinion from

the Regional Councils regarding its proposed regulations."). Accordingly, even if the Court does consider the Armstrong Declaration, it cannot remedy DOE's failure to consult with HUD.

<u>CONCLUSION</u>

The Court should hold unlawful and set aside the Final Rule. DOE's disregard for statutory mandates under EISA and the APA will compromise access to affordable housing and impose undue burdens on low-income families. Given the "seriousness of the deficiencies of the action," there is nothing DOE can "do on remand to rehabilitate or justify the challenged portions of the Rule as written." *See Texas Med. Ass'n v. United States Dep't of Health & Hum. Servs.*, 587 F. Supp. 3d 528, 548 (E.D. Tex. 2022). DOE's failure to consider the post-pandemic macroeconomic environment and its effects on the manufactured housing construction industry undermines virtually every aspect of its rulemaking. *See supra* at 26. Similarly, DOE cannot remedy its decision to ignore affordability concerns for low-income purchasers of multi-section homes without substantial changes to its Tier 2 standards. *See supra* at 26–30. And DOE must engage in the EISA-required HUD consultation *before* promulgating substantive standards. *See supra* at 30–31. Accordingly, vacatur is necessary. *See Texas Med. Ass'n*, 587 F. Supp. 3d at 548 ("'[B]y default, remand *with* vacatur is the appropriate remedy.'").

Respectfully submitted, this 10th day of January, 2025.

/s/ Carlos R. Soltero
Carlos R. Soltero
State Bar of Texas No. 00791702
csoltero@maynardnexsen.com
Gregory P. Sapire
State Bar of Texas No. 00791601
gsapire@maynardnexsen.com
MAYNARD NEXSEN PC
500 Bee Cave Road, Bldg 1, Suite 150
Austin, Texas 78746

(512) 422-1559 – Telephone
(512) 359-7996 – Facsimile

Thomas W. Thagard (*pro hac vice*)
State Bar of Texas No. 24134186
tthagard@maynardnexsen.com
James C. Lester (*pro hac vice*)
jlester@maynardnexsen.com
MAYNARD NEXSEN PC
1901 Sixth Avenue North, Suite 1700
Birmingham, AL 35203
(205) 254-1000 – Telephone

Scott Simpson (*pro hac vice*)
wsimpson@smgblawyers.com
Daniel S. Weber (*pro hac vice*)
dsweber@smgblawyers.com
SIMPSON, MCMAHAN, GLICK & BURFORD, PLLC
100 Concourse Parkway
Suite 310 West Tower
Hoover, AL 35244
(205) 876-1600 – Telephone

*Attorneys for Plaintiffs*

**<u>CERTIFICATE OF SERVICE</u>**

I hereby certify that a true and correct copy of the foregoing instrument was served on all counsel of record via the Court's ECF system on January 10, 2025.


<u>/s/ James C. Lester</u>
James C. Lester